JUDGE CASTEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

SANJIV MEHRA,
:
                         Plaintiff,      :      Civil Action No. _____

                         :      **'07 CIV 8242**

      - against -
:

PHOENIX BRANDS LLC and ADMINISTAFF, INC.,  :       **[JURY] TRIAL DEMANDED**

                 Defendants.   :      SEP 2 1 2007

------------------------------------------------------------------------x    U.S.D.C. S.D.N.Y.
                                                CASHIERS

## COMPLAINT

Upon personal knowledge as to his own actions and upon information and belief as to all other matters, Plaintiff Sanjiv Mehra, by his attorneys Spears & Imes LLP and for his Complaint, alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for breach of contract and for a declaratory judgment. Plaintiff alleges that he has been constructively discharged from his employment at Defendant Phoenix Brands LLC ("Phoenix") and wrongfully denied the termination benefits to which he is contractually entitled. Plaintiff seeks to recover those benefits from Defendant Phoenix and from Defendant Administaff, Inc ("Administaff"). Plaintiff also holds a considerable amount of equity in Defendant Phoenix in the form of Common Units, Profit B Units, and Management Units. In light of his constructive discharge, Plaintiff seeks to ensure that Defendant Phoenix will not unlawfully deprive him of the value of that equity. Accordingly, Plaintiff requests a declaratory judgment that: (1) he has entered into valid and enforceable contracts with Defendant Phoenix that grant him the above-described equity in the company; (2) he is entitled

to recover the value of that equity in accordance with the terms of those contracts; and (3) he was not discharged for cause, and therefore has not forfeited any of his Management Units on those grounds.

## THE PARTIES

2.     Plaintiff is a resident of the state of New York and resides at 11 Stonehouse Road, Scarsdale, New York 10583.

3.     Defendant Phoenix is a Delaware limited liability company with its principal place of business at 300 Atlantic Street, Stamford, Connecticut 06901.

4.     Upon information and belief, Defendant Administaff is a Delaware corporation with its principal place of business at 19001 Crescent Springs Drive, Houston, Texas 77339-3802. Also upon information and belief, Defendant Administaff is a professional employer organization that serves as Defendant Phoenix's human resources department and, in that capacity, functioned as Plaintiff's co-employer.

## JURISDICTION AND VENUE

5.     This is a civil action seeking compensatory damages for breach of contract, along with a declaratory judgment.

6.     The Court has subject matter jurisdiction over these claims on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1), as Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

2

7.     The Court has personal jurisdiction over Defendant Phoenix because Defendant Phoenix does business in the state of New York, *i.e.*, is engaged in a continuous and systematic course of doing business in this state. The Court also has personal jurisdiction over Defendant Phoenix because Defendant Phoenix has transacted business within the state of New York, and the instant action arises out of Defendant Phoenix's in-state conduct.

8.     The Court has personal jurisdiction over Defendant Administaff because Defendant Administaff does business in the state of New York, *i.e.*, is engaged in a continuous and systematic course of doing business in this state.

9.     Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a)(2), as a substantial part of the events giving rise to Plaintiff's claims occurred here.

**DEFENDANT PHOENIX'S BUSINESS AND PLAINTIFF'S ROLE**

10.     Defendant Phoenix is a North American consumer products company, whose portfolio includes dish detergents, laundry detergents and laundry aids, fabric softeners, and spray starches.

11.     Defendant Phoenix was formed in December 2003, when it secured financing from Lehman Brothers, Inc. and acquired four brands from consumer products giant Unilever.

12.     Upon Defendant Phoenix's formation, Plaintiff assumed the position of Chief Administrative Officer ("CAO"). As CAO, Plaintiff always served Defendant Phoenix faithfully and conscientiously. In addition to handling numerous financial responsibilities, Plaintiff managed the company's supply chain; negotiated major supplier relationships; supervised the

legal, human resources, information technology, and customer service departments; and played an active role in innovation management and reformulations.

13.    Since Defendant Phoenix's inception, Plaintiff has been dedicated to the company's success, and instrumental in its development.

### PLAINTIFF'S CONSTRUCTIVE DISCHARGE

14.    On June 21, 2007, however, Defendant Phoenix informed Plaintiff that it was placing him on a paid leave of absence. He was instructed not to communicate with the company's employees, suppliers, and customers, and not to use any of the company's systems, including its computer, electronic mail, and voicemail systems. Moreover, he was told that Defendant Phoenix expected him to make himself available to meet or speak with the company regarding any matters that occurred during his employment.

15.    Plaintiff, as instructed, exited Defendant Phoenix's premises, surrendered his post at its offices, and made himself available at its request. He was consistently helpful, responsive, and cooperative, and agreed to assist Defendant Phoenix with business issues that arose.

16.    Nevertheless, by letter of July 20, 2007, Defendant Phoenix's counsel confirmed that Plaintiff had been "relieved of his prior responsibilities as Chief Administrative Officer". The letter stated that Plaintiff's "only job now is to be available to provide information as requested by designated Company personnel and follow the instructions of the Company".

17.    Defendant Phoenix's counsel also claimed that the company would have "cause" for terminating Plaintiff's employment. However, Defendant Phoenix declined to formally

4

discharge Plaintiff, and has never specified what, exactly, its cause for terminating his employment might be.

18.    Over two months later, and despite multiple efforts on Plaintiff's part to settle this dispute, the situation has not changed.  To date, Plaintiff has not been formally terminated.  Yet, he continues to be stripped of his role at CAO and banned from any meaningful participation in the company – even the mere ability to enter its offices and speak with his colleagues.

19.    Plaintiff, in short, has been constructively discharged from his employment at Defendant Phoenix.  His working conditions are so intolerable that a reasonable person in his position would have felt compelled to resign.

20.    Moreover, Defendant Phoenix's imposition of these intolerable working conditions has been deliberate, and purposely designed to compel Plaintiff to resign.

### THE RIGHT TO TERMINATION BENEFITS

21.    Having been constructively discharged, Plaintiff has certain rights under the human resources policies (the "Policies") of Defendant Phoenix and Defendant Administaff. The Policies are a set of written procedures that specify Defendant Phoenix and Defendant Administaff's practices with respect to their employment relationship with Plaintiff.

22.    Upon information and belief, the Policies entitle Plaintiff to, at a minimum, the following benefits in the event of his discharge:  (1) a lump sum payment of one year's base pay plus bonus and accrued vacation; (2) accrued bonus for the time worked during the year; (3)

outplacement fees estimated at $45,000; (4) medical coverage; (5) a buyout of his car lease; and (6) reimbursement of normal and customary business expenses.[1]

23.    The Policies are an express, written limitation on the ability to discharge Plaintiff, as they require that Plaintiff be provided the above-specified compensation in the event that his employment is terminated.

24.    Plaintiff was made aware of the Policies' existence by Defendant Phoenix and/or Defendant Administaff.  Indeed, Plaintiff helped author the Policies.

25.    Moreover, Plaintiff detrimentally relied on the Policies, including their procedures for termination, in accepting and continuing his employment.

26.    Accordingly, the Policies are part of a valid and enforceable employment contract between Plaintiff, Defendant Phoenix, and Defendant Administaff.

27.    Defendant Phoenix and Defendant Administaff, by failing to provide Plaintiff with the termination benefits specified under the Policies, are in breach of that employment contract.

**THE RIGHT TO EQUITY**

28.    Plaintiff also holds a substantial number of units in Defendant Phoenix that represent equity.  Plaintiff, notwithstanding the termination of his employment, is entitled to recover the value of that equity, under the terms set forth in the applicable contracts.

---

[1] Plaintiff has been denied access to all of Defendant Phoenix's systems and did not maintain a copy of the Policies at his residence.  As a result, he is not currently in possession of the Policies and has been unable to attach them to this Complaint.  Notably, Plaintiff's written request for a copy of the Policies has been ignored by Defendant Phoenix.

29.    *First*, under the Third Amended and Restated Limited Liability Company Agreement ("LLC Agreement") between Defendant Phoenix and its Members, including Plaintiff, dated January 1, 2005, Plaintiff holds 25 fully vested, non-forfeitable Common Units in Defendant Phoenix, which have a face value of $25,000.  A copy of the LLC Agreement is attached hereto as Exhibit A.

30.    *Second*, under a series of Profit B Unit Agreements between Plaintiff and Defendant Phoenix, dated January 1, 2005, March 14, 2006, and March 1, 2007, Plaintiff holds 1160 fully vested, non-forfeitable Profit B Units in Defendant Phoenix, which have a face value of $1,160,000.  Copies of the Profit B Unit Agreements are attached hereto as Exhibits B, C, and D, respectively.

31.    On September 21, 2007, Plaintiff notified Defendant Phoenix that, pursuant to Section 3.3(h) of the LLC Agreement, he wishes to exercise his right to convert each of his Profit B Units into one Common Unit.  Common Units, under Section 3.4 of the LLC Agreement, rank senior to Profit B and Management Units with respect to return, distribution, dividend, and redemption rights, and in the event of liquidation, winding-up, and dissolution of Defendant Phoenix.  Thus, upon conversion of his 1160 Profit B Units into 1160 Common Units, Plaintiff will hold a total of 1185 fully vested, non-forfeitable Common Units that rank senior to the other types of units issued by Defendant Phoenix.

32.    *Finally*, under a series of Management Unit Agreements between Plaintiff and Defendant Phoenix, dated October 24, 2004, January 1, 2005, and November 10, 2005, Plaintiff was granted 1178 Management Units in Defendant Phoenix, which were unvested upon grant

and set to vest over five-year periods. Copies of the Management Unit Agreements are attached hereto as Exhibits E, F, and G, respectively.

33.    To date, 709.6 of Plaintiff's 1178 Management Units remain unvested. Defendant Phoenix, by constructively discharging Plaintiff, has effectively denied him the value of those units, which, by their terms, are forfeited upon termination of employment "for any reason or no reason".

34.    However, 468.4 of Plaintiff's Management Units have now vested and are forfeitable only upon termination of Plaintiff's employment for "cause". Because Plaintiff was not terminated for cause, he has not forfeited any of his vested Management Units, which have a face value of $468,400.

35.    In total, then, Plaintiff holds 1653.4 units of equity in Defendant Phoenix, which have a combined face value of $1,653,400. Plaintiff continues to retain all of his rights in those units, consistent with the terms of the aforementioned contracts, and irrespective of his constructive discharge from the company.

## COUNT I: BREACH OF CONTRACT
(Against all Defendants)

36.    Plaintiff repeats and realleges paragraphs 1 through 35, which are incorporated by reference as if fully set forth herein.

37.    The Policies are part of a valid and enforceable employment contract between Plaintiff, Defendant Phoenix, and Defendant Administaff.

8

38.    The Policies are express written procedures that limit the right of Defendant Phoenix and/or Defendant Administaff to terminate Plaintiff's employment, by entitling him to certain benefits in the event that he is discharged.

39.    Defendant Phoenix and/or Defendant Administaff made Plaintiff aware of the Policies during the course of his employment.

40.    Plaintiff detrimentally relied on the Policies, including their procedures for termination, in accepting and continuing his employment.

41.    Plaintiff has fully performed his obligations under the Policies.

42.    Defendant Phoenix has constructively discharged Plaintiff, by deliberately creating working conditions so intolerable that a reasonable person in his position would have felt compelled to resign.

43.    Nevertheless, Defendant Phoenix and Defendant Administaff have failed to provide Plaintiff with any of the termination benefits he is owed under the Policies.

44.    Accordingly, Defendant Phoenix and Defendant Administaff are in breach of their contractual obligations under the Policies.

45.    Plaintiff has incurred damages as a direct and proximate result of the breach of contract by Defendant Phoenix and Defendant Administaff.

## COUNT II: DECLARATORY JUDGMENT
(Against Defendant Phoenix)

46.    Plaintiff repeats and realleges paragraphs 1 through 45, which are incorporated by reference as if fully set forth herein.

47.    The LLC Agreement is a valid and enforceable contract between Defendant Phoenix and its Members, including Plaintiff.

48.    The Profit B Unit Agreements are valid and enforceable contracts between Defendant Phoenix and Plaintiff.

49.    The Management Unit Agreements are valid and enforceable contracts between Defendant Phoenix and Plaintiff.

50.    Under these contracts, and as set forth above, Plaintiff has the right to a specifically enumerated amount of equity in Defendant Phoenix.

51.    There is an actual, substantial, and immediate controversy between the parties with respect to that equity, in light of Plaintiff's constructive discharge from Defendant Phoenix.

52.    Plaintiff therefore seeks a declaration of his legal rights pursuant to 28 U.S.C. § 2201.

53.    Specifically, Plaintiff seeks a declaratory judgment that: (1) he has entered into valid and enforceable contracts with Defendant Phoenix that grant him equity in the company; (2) he is entitled to recover the value of that equity in accordance with the terms of those

10

contracts; and (3) he was not discharged for cause, and therefore has not forfeited any of his Management Units on those grounds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment for compensatory damages in his favor, in an amount to be determined at trial, as well a declaratory judgment in his favor, and grant such other and further relief as this Court may deem just and proper, including costs, disbursements, and reasonable attorney's fees.

Dated: September 21, 2007
      New York, New York

SPEARS & IMES LLP

By: _____David Spears_____

David Spears
Sarah E. Paul
Spears & Imes LLP
51 Madison Avenue
New York, New York 10010
(212) 213-6996

Attorneys for Plaintiff Sanjiv Mehra

# EXHIBIT A

**EXECUTION COPY**

THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY

AGREEMENT

OF

PHOENIX BRANDS LLC
a Delaware Limited Liability Company

Dated as of January 1, 2005

THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY
AGREEMENT
OF
PHOENIX BRANDS LLC

a Delaware Limited Liability Company

This Third Amended and Restated Limited Liability Company Agreement (as further amended, modified, supplemented and/or restated from time to time, this *"Agreement"*) of PHOENIX BRANDS LLC, a Delaware limited liability company (the *"Company"*), dated as of January 1, 2005, is executed by and between the Members, each as listed on Exhibit A attached hereto, and the Company.

WHEREAS, Winter Holdings LLC was formed as a limited liability company under the Act pursuant to a Certificate of Formation, which was executed and filed with the Secretary of State of the State of Delaware on August 18, 2003;

WHEREAS, an amended and restated Certificate of Formation was filed with the Secretary of State of the State of Delaware on December 30, 2003, pursuant to which, among other things, the name of Winter Holdings LLC was changed to Phoenix Brands LLC; and

WHEREAS, the Members and the Company desire to enter into this Agreement to provide for the ongoing governance of the Company, to set forth their respective rights and obligations as a Member of the Company and to provide for the management and the conduct of the business of the Company, amending and restating in their entirety the terms of the Limited Liability Company Agreement of the Company dated July 9, 2003, as further amended pursuant to the Amended and Restated Limited Liability Company Agreement of the Company dated January 5, 2004 and the Second Amended and Restated Limited Liability Company Agreement of the Company dated July 29, 2004.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Members and the Company agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1.    **Definitions.**

As used in this Agreement, the following terms have the following meanings:

*"Acquisition Proposal"* has the meaning set forth in Section 3.5(d).

*"Act"* means the Delaware Limited Liability Company Act, 6 Del. C. §18-101 et seq., as amended from time to time, and any successor statute.

"*Additional Units*" has the meaning set forth in Section 3.5(c).

"*Affiliate*" means, with respect to a specified Person, (a) any Person that, directly or indirectly, is in control of, is controlled by or is under common control with such specified Person, (b) any Person who is a director or officer (i) of such specified Person, (ii) of any Subsidiary of such specified Person or (iii) of any Person described in clause (a) above, or (c) with respect to any Member who is a natural Person, a Permitted Transferee of such Member. For purposes of this definition, "control" of a Person shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether by ownership of securities, contract, proxy or otherwise.

"*Affiliate Financing*" has the meaning set forth in Section 3.6(b).

"*Affiliate Lender*" has the meaning set forth in Section 3.6(b).

"*Agreement*" means this Third Amended and Restated Limited Liability Company Agreement as further amended, modified, supplemented and/or restated from time to time.

"*Board Committee*" has the meaning set forth in Section 6.1(b).

"*Board of Managers*" or "*Board*" means the governing body of the Company established in accordance with Article 6.

"*Capital Account*" means the capital account of a Member as adjusted up to the date of determination pursuant to Section 4.3.

"*Capital Contributions*" means any contributions by a Member to the capital of the Company.

"*Certificate*" has the meaning set forth in Section 2.1.

"*Code*" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"*Common Member(s)*" means (a) each of the Persons designated as holding Common Units on Exhibit A hereto and (b) such other Persons who shall acquire Common Units in accordance with the terms of this Agreement and the Act.

"*Common Units*" means units representing capital interests in the Company and having such powers, preferences, rights, qualifications, limitations and restrictions of Common Units as specified in this Agreement.

"*Company*" has the meaning set forth in the Preamble.

"*Confidential Information*" has the meaning set forth in Section 11.11.

"*Drag-Along Right*" has the meaning set forth in Section 3.5(d).

"*Drag-Along Sale*" has the meaning set forth in Section 3.5(d).

*"Drag-Along Seller"* has the meaning set forth in Section 3.5(d).

*"Drag-Along Unrelated Party"* has the meaning set forth in Section 3.5(d)(i).

*"Exchange Act"* means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

*"Fair Market Value"* of Membership Units or other property, as the case may be, means the cash price that an unaffiliated third party would pay to acquire such Membership Units or other property in an arm's-length transaction between a willing seller and a willing and able buyer, neither of which is under any compulsion to complete the transaction, as reasonably determined by the Board of Managers. Such valuation shall take into consideration the relative rights of one class of the Membership Units vis-à-vis another, including any preference to receive funds in the case of a sale of the Company, liquidation or other similar event.

*"Financing Participation Right"* has the meaning set forth in Section 3.6(b).

*"Fiscal Year"* means the Company's fiscal year, which shall be the same as a calendar year and shall end on December 31 of each year unless the Board of Managers shall elect another fiscal year which is a permissible tax year under the Code.

*"Founding Member"* means (a) Lehman until the earlier of the date at which (i) Lehman owns less than 50% of the Membership Units Lehman owns as of the date hereof (adjusted to account for equity splits or dividends, reverse or otherwise) or (ii) Lehman owns, in the aggregate, less than 30% of the then outstanding Membership Units, or (b) following such earlier date as determined in (a), holders of a majority of the Common Units then outstanding.

*"GAAP"* means generally accepted accounting principles as in effect in the United States from time to time and consistently applied.

*"including"* means including, without limitation.

*"Lehman"* means Lehman Phoenix SPV LLC.

*"Lehman Parties"* shall mean Lehman, its direct and indirect Permitted Transferees, and their respective Affiliates.

*"Management Member(s)"* means any Person who is issued and holds Management Units in accordance with the terms of this Agreement so long as such Person holds Management Units.

*"Management Units"* means units initially representing profit interests in the Company issued to any executive of the Company and its Subsidiaries as part of any executive compensation or incentive plan or program in the ordinary course of business and having such powers, preferences, rights, qualifications, limitations and restrictions of Management Units as specified in this Agreement.

"*Managers*" means the members of the Board of Managers duly appointed or designated pursuant to Article 6.

"*Marketable Securities*" means securities listed on a national securities exchange or quoted in the NASDAQ Stock Market System which are not subject to a contractual prohibition on the sale of such securities for a period of time.

"*Member(s)*" means any Common Member(s), Profit B Member(s) and Management Member(s).

"*Membership Unit(s)*" or "*Unit(s)*" means any Common Unit(s), Profit B Unit(s) and Management Unit(s).

"*New Units*" means (i) any Membership Units of the Company and any other securities representing an equity interest in the Company that may be issued by the Company, (ii) any rights, options or warrants to purchase such Membership Units and (iii) securities of any type whatsoever that are, or may become, convertible into or exchangeable or exercisable for Membership Units, in each case that are issued after the date hereof; provided, that the term "New Units" shall not include (a) any securities of the Company issued in connection with any equity split or equity dividend of units of the Company or similar event, (b) Profit B Units issued to any employee of the Company and its Subsidiaries as part of any executive compensation or incentive plan or program approved by, or pursuant to arrangements approved by, the Board of Managers, (c) any Common Units or Management Units issued to any executive of the Company and its Subsidiaries as part of any executive compensation or incentive plan or program approved by, or pursuant to arrangements approved by, the Board of Managers, which plan or program in the aggregate (including all authorized Common Units and Management Units, whether issued or unissued) represents no greater than 8% of the then outstanding Membership Units, and (d) any Common Units issued pursuant to the exercise of any option granted under the terms of the Witkoff Option Agreement.

"*Notice of Issuance*" has the meaning set forth in Section 3.5(e)(ii).

"*Oaktree*" means OCM Phoenix Holdings, Inc., a Delaware corporation, or its successors and assigns.

"*Oaktree Shares*" means shares of capital stock of Oaktree.

"*Observer*" has the meaning set forth in Section 6.1(d).

"*Percentage Interest*" means, as of any date of determination, with respect to any Common Member, Profit B Member or Management Member, the amount, expressed as a percentage, equal to (i) the number of Common Units, Profit B Units or Management Units beneficially owned by such Common Member, Profit B Member or Management Member as of such date, divided by (ii) the total number of Common Units, Profit B Units and Management Units outstanding as of such date.

"*Permitted Transferees*" means, with respect to (i) any Member who is a natural Person (A) a trust or custodianship, of which the beneficiaries may include only such Member and such

Person's spouse and lineal descendants by blood or adoption, and (B) upon the death of such Member or any other Permitted Transferee of such Member, the respective executors, administrators, testamentary trustees, legatees or beneficiaries of such Person, and (ii) any Member who is not a natural Person, an Affiliate of such Person.

"*Person*" means any individual, partnership, company, limited liability company, joint venture, association, joint stock company, trust, unincorporated organization, government or agency or political subdivision thereof, or other entity.

"*Phoenix Investors*" means Phoenix Investors LLC, a Delaware limited liability company, or its successors and assigns.

"*Profit B Member(s)*" means (a) each of the Persons designated as holding Profit B Units on Exhibit A hereto and (b) such other Persons who shall acquire Profit B Units in accordance with the terms of this Agreement and the Act.

"*Profit B Units*" means units representing profit interests in the Company and having such powers, preferences, rights, qualifications, limitations and restrictions of Profit B Units as specified in this Agreement.

"*Profits*" or "*Losses,*" as the case may be, means the taxable income or loss of the Company for federal income tax purposes determined in accordance with Code Section 703(a) as of the close of the Fiscal Year (or such other time as may be required by this Agreement), inclusive of all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a), adjusted as follows:

(i)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(ii)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures under Code Section 704(b) and the Regulations thereunder and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(iii)    gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the book value of such property rather than its adjusted tax basis;

(iv)    in lieu of the depreciation, depletion, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, cost recovery or amortization computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g)(3); and

(v)    in the event of an adjustment of the book value of any Company asset which requires that Capital Accounts be adjusted pursuant to Regulations Sections 1.704-1(b)(2)(iv)(e), (f) and (m), the amount of such adjustments are, in the case

of Regulations Sections 1.704-1(b)(2)(iv)(e) and (f), to be taken into account as gain or loss from a taxable disposition of Company property pursuant to paragraph (iii) above, and, in the case of Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account as additional Profits or Losses but subject to the special allocations as described in Section 5.1(b) hereof.

Notwithstanding any other provision hereof, any items which are specially allocated pursuant to the provisions of Section 5.1(b) hereof shall not be taken into account in computing Profits or Losses.

"*Proposed Transfer*" has the meaning set forth in Section 3.5(b).

"*Proposed Unit Sale*" has the meaning set forth in Section 3.5(c)(i).

"*Proposed Units Sale Notice*" has the meaning set forth in Section 3.5(c)(i).

"*Registrar*" has the meaning set forth in Section 3.3(d).

"*Registration Rights Agreement*" means that certain Registration Rights Agreement executed concurrently herewith by certain Members and the Company, as may be amended from time to time.

"*Regulations*" means the Treasury regulations promulgated under the Code, including temporary regulations, as such regulations are in effect from time to time. References to specific provisions of such regulations include references to corresponding provisions of successor regulations.

"*Requirements of Law*" means, as to any Person, any law, statute, treaty, rule, regulation, ruling, position, interpretation or interpretive position, right, privilege, qualification, license or franchise or determination of an arbitrator or a court or other governmental authority, in each case applicable or binding upon such Person or any of its property or to which such Person or any of its property is subject or pertaining to any or all of the transactions contemplated or referred to herein.

"*Right of First Refusal*" has the meaning set forth in Section 3.5(b).

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

"*Securities Purchase Agreement*" means the Securities Purchase and Guaranty Agreement, dated as of July 29, 2004, among the Company, Phoenix Rit LLC, Phoenix Niagara LLC, Phoenix Sunlight LLC, Phoenix Final Touch LLC, and each of the persons named in the purchaser schedule attached thereto, as it may be amended, modified, supplemented, renewed, extended, replaced, refinanced, refunded or substituted from time to time.

"*Subsidiary*" of any Person means another Person, (a) of which 50% or more of any class of capital stock, voting securities, other voting ownership or voting partnership interests (or, if

there are no such voting interests, 50% or more of the equity interests) are owned or controlled, directly or indirectly, by such first Person or (b) of which such first Person is a general partner.

*"Tag-Along Allotment"* has the meaning set forth in Section 3.5(c).

*"Tag-Along Notice"* has the meaning set forth in Section 3.5(c)(i).

*"Tag-Along Right"* has the meaning set forth in Section 3.5(c)(i).

*"Tag-Along Unrelated Party"* means any Person other than (i) any Lehman Party to whom Common Units are proposed to be Transferred at a price per Common Unit equal to or less than $1,000 (as adjusted to account for Unit splits or dividends, reverse or otherwise), or (ii) the Company or any of its Affiliates.

*"Tax Matters Member"* has the meaning set forth in Section 8.4.

*"Taxable Year"* means the taxable year of the Company (or portion thereof) which shall end on December 31 in each year (unless otherwise provided by the Requirements of Law); provided, however, that upon termination of the Company, "Taxable Year" means the period from January 1 immediately preceding such termination to the date thereof.

*"Third Party Restrictions"* means any applicable covenants and restrictions contained in the Company's loan documents and other third party arrangements or any other obligations to which the Company or its properties are subject.

*"Trading Day"* means any day other than a Saturday, Sunday or other day on which the Nasdaq National Market or the New York Stock Exchange are authorized to close.

*"Transfer"* means any transfer, sale, assignment, lease, mortgage, exchange, pledge, grant of a security interest, hypothecation or other disposition or encumbrance (including, without limitation, by operation of law or otherwise) of any record or beneficial ownership interest in any Units.

*"Transfer Notice"* has the meaning set forth in Section 3.5(b).

*"Transfer Terms"* has the meaning set forth in Section 3.5(b).

*"Witkoff Option Agreement"* means that certain Option Agreement executed concurrently herewith by The Witkoff Group LLC, a New York limited liability company, and the Company, as it may be amended from time to time.

1.2.    **Construction.**

(a) Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine and neuter. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits are to Exhibits attached hereto, each of which is made a part hereof for all purposes. All accounting terms not defined in this Agreement shall have the meaning determined by GAAP.

(b) For purposes herein, any determination made with respect to the Membership Units on an "as converted basis" shall be determined on the basis of Common Units by using a conversion ratio of one Management Unit or one Profit B Unit to one Common Unit.

# ARTICLE 2
# ORGANIZATION

### 2.1. Formation.

The Company has been organized as a Delaware limited liability company by the filing of a Certificate of Formation (the *"Certificate"*) with the office of the Secretary of State of the State of Delaware as required under and pursuant to the Act. The rights and obligations of the Members shall be as provided in the Act, except as otherwise provided herein.

### 2.2. Name.

The name of the Company is "Phoenix Brands LLC" and all Company business must be conducted in that name or such other names that comply with the Requirements of Law as the Board of Managers may select from time to time. The Company was formerly known as "Winter Holdings LLC", and any action taken in such name shall be deemed to be the action of the Company.

### 2.3. Registered Office; Registered Agent; Principal Office; Other Offices.

The registered office of the Company shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Board of Managers may designate from time to time in the manner provided by the Requirements of Law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Board of Managers may designate from time to time in the manner provided by the Requirements of Law. The principal place of business of the Company and any other offices of the Company shall be at such locations as the Board of Managers may designate from time to time.

### 2.4. Purpose.

The purpose of the Company is to transact any and all lawful business for which limited liability companies may be organized under the Act.

### 2.5. Term.

The Company commenced on the date of the filing of the Certificate with the Secretary of the State of Delaware and shall continue in existence perpetually or until its affairs are wound up in accordance with the Act or such time as this Agreement may specify.

### 2.6. Powers.

The Company shall possess and may exercise any and all the powers and privileges granted by the Act or by any other Requirements of Law applicable to limited liability

companies or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business, purposes or activities of the Company.

2.7.    Filings.

The Board of Managers shall cause the execution and delivery of such documents and performance of such acts consistent with the terms of this Agreement as may be necessary to comply with the Requirements of Law for the formation, qualification and operation of a limited liability company under the laws of each jurisdiction in which the Company conducts business.

## ARTICLE 3
### MEMBERSHIP; CONVERSION; DISPOSITIONS OF INTERESTS

3.1.    Members.

The Members of the Company are listed on the attached Exhibit A, each of which, to the extent not already a Member, is admitted to the Company as a Member effective as of the date hereof and contemporaneously with the execution by such Person of this Agreement, and each of which shall hold the number and type of Units set forth opposite such Member's name on Exhibit A hereto.

3.2.    Admission of Members.

(a) The Board of Managers shall have the authority to admit new Members at such times and on such terms and conditions (including the amount of such Person's Capital Contributions and the number of Units to be issued to such Person) as the Board of Managers shall determine, in its sole and absolute discretion and subject to Section 3.3(a) and Section 3.5; provided that no such admission shall be effective until the new Member has agreed in writing to be governed by all of the terms and conditions of this Agreement.

(b) Only the Board of Managers shall be authorized, by resolution or resolutions, to create and to issue different classes, groups or series of Units and fix for such class, group or series such voting powers, full or limited or no voting powers, and such distinctive designations, limitations or restrictions as determined by the Board of Managers (including setting the value of the assets of the Company at the time Management Units are issued in order that such Units will constitute profit interests in the Company in compliance with Section 4.3 of this Agreement), and such resolution or resolutions of the Board of Managers shall set forth such amendments to this Agreement as shall be necessary or reasonable in the sole judgment of the Board of Managers to effect such resolutions, and such amendments shall be binding upon all Members of the Company upon adoption in accordance with Section 11.6.

(c) Exhibit A shall be amended from time to time by the Board of Managers to reflect the admission of any new Members, additional Capital Contributions made by any Members and any Transfers of the Units, each as permitted by the terms of this Agreement.

**3.3.    Classification of Membership Units.**

(a) <u>General</u>.  The series of Membership Units shall be designated as "Common Units," , "Management Units," and "Profit B Units".  Each Common Unit shall be identical in all respects to every other Common Unit.  Unless otherwise specifically determined by the Board of Managers pursuant to Section 3.2(b) above and set forth in the applicable granting document, each Management Unit and Profit B Unit shall be identical in all respects to every other Management Unit and Profit B Unit, respectively.

(b) <u>Available Units</u>.  The number of Common Units available for issuance as of the date hereof shall be 100,000 Units.  The number of Management Units available for issuance as of the date hereof shall be 4,654 Units.  The number of Profit B Units available for issuance as of the date hereof shall be 2,000 Units.  The aggregate number of Membership Units available for issuance shall be adjusted from time to time by the Board of Managers to account for any new Members admitted in accordance with Section 3.2.

(c) <u>Voting</u>.  Each Common Member shall be entitled to one vote per Common Unit held by it on any matters submitted to a vote of the Members.  Each Profit B Member shall be entitled to one vote per Profit B Unit held by it on any matters submitted to a vote of the Members, voting with the Common Members, but not as a separate class.  Except as required by the Requirements of Law, the Management Members shall not be entitled to vote with respect to their Management Units on any matters submitted to a vote of the Members.

(d) <u>Certificated Units</u>.  Common Units, Management Units and Profit B Units may be issuable in certificated form at the discretion of the Board of Managers.  The Company shall serve as initial registrar and transfer agent (the *"Registrar"*) for the Membership Units.

(e) <u>Legends</u>.  The certificates representing the Membership Units shall bear a legend to the following effect, unless the Company determines otherwise in compliance with the Requirements of Law:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES.  SUCH UNITS MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OTHER THAN PURSUANT TO AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS.
>
> THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN ADDITIONAL RESTRICTIONS ON TRANSFER AS SET FORTH IN A THIRD AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT DATED AS OF JANUARY ___, 2005, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICES OF THE ISSUER.  NO REGISTRATION OF

TRANSFER OF SUCH UNITS WILL BE MADE ON THE BOOKS OF
THE ISSUER UNLESS AND UNTIL SUCH RESTRICTIONS SHALL
HAVE BEEN COMPLIED WITH."

(f) Lost or Destroyed Certificates. If any of the Membership certificates shall be
mutilated, lost, stolen or destroyed, the Company shall issue, in exchange and in substitution for
and upon cancellation of the mutilated Membership Unit certificate or in lieu of and substitution
for the Membership Unit certificate lost, stolen or destroyed, a new Membership Unit certificate
representing an equivalent amount of Membership Units but only upon receipt of evidence of
such loss, theft or destruction of such Membership Unit certificate and indemnity, if requested,
reasonably satisfactory to the Company.

(g)    Vesting, Forfeiture and Repurchase of Management Units. Subject to amendment
and modification by the Board of Managers in accordance with Article 3 herein prior to vesting,
all Management Units shall contain and be subject to terms relating to vesting, forfeiture and
repurchase substantially similar to the terms set forth on Exhibit B attached hereto.

(h)    Conversion of Profit B Units. Each Profit B Unit shall be convertible, at the
option of the holder thereof, at any time after ninety (90) days after the date of the issuance of
such Profit B Unit, at the office of the Company or any transfer agent for such Profit B Unit, into
one Common Unit, as adjusted to account for Unit splits or dividends, reverse or otherwise.

3.4.    Ranking.

The Common Units shall, with respect to return, distribution, dividend and redemption
rights and in the event of liquidation, winding-up and dissolution of the Company, rank senior to
Profit B Units and Management Units to the extent set forth herein. The Profit B Units shall,
with respect to return, distribution, dividend and redemption rights and in the event of
liquidation, winding-up and dissolution of the Company, rank senior to Management Units to
the extent set forth herein.

3.5.    Transfers of Units.

(a) General. Without the approval of the Board of Managers no Member shall, by
operation of law or otherwise, Transfer any Membership Units or any other right, title or interest
in or to the Company nor in or to any assets of the Company nor enter into any agreement as a
result of which any Person will or can obtain any interest in the Company, other than to any
Permitted Transferees, and any and all attempts to do so shall be null and void and of no force or
effect whatsoever; provided, however, that, subject to Section 3.5(f), the foregoing restriction
shall not apply with respect to (i) any Transfers of Membership Units by any Lehman Party
(subject to any Member's Tag-Along Right as provided in Section 3.5(c)) or Phoenix Investors
or any of its Permitted Transferees, (ii) any purchase of Membership Units by any Lehman Party
pursuant to an exercise of the Right of First Refusal, or with respect to any sale of Membership
Units by any other Member pursuant to an exercise of the Tag-Along Right or the Drag-Along
Right, or (iii) any pledge of Units by any Member (or foreclosure upon such pledge) as may be
required in connection with the Company's loan documents. No Member shall avoid the
provisions of this Agreement by disposing of all or any portion of such party's interest in a

Person holding, directly or indirectly, the Membership Units, including by making one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee, and any Transfer or attempted Transfer in violation of this convenant shall be null and void *ab initio*.

(b) Right of First Refusal. Subject to required approvals by the Board of Managers in accordance with Section 3.5(a), if any Common Member, Profit B Member or Management Member, other than any Lehman Party, proposes to transfer any of its Common Units, Profit B Units or Management Units (a *"Proposed Transfer"*) to any party that is not a Permitted Transferee of such transferring Member, such Common Member, Profit B Member or Management Member shall provide the Company and Lehman a written notice by first class mail at least 30 days but no more than 60 days prior to the proposed date of such Proposed Transfer (the *"Transfer Notice"*), which Transfer Notice shall set forth all of the material terms and conditions of such Proposed Transfer, including the number of Common Units, Profit B Units or Management Units to be transferred and the price per Common Unit, Profit B Unit or Management Unit to be paid in connection therewith (the *"Transfer Terms"*). The Lehman Parties shall have the right, at their sole option, for a period of 10 Trading Days after Lehman's receipt of such Transfer Notice, to purchase all of such Common Units, Profit B Units or Management Units offered in the Proposed Transfer at the Transfer Terms, by paying, by wire transfer in immediately available funds, the amount set forth in the Transfer Notice to such Common Member, Profit B Member or Management Member (the *"Right of First Refusal"*). In the event such Proposed Transfer involves all of the Common Units, Profit B Units or Management Units held by such Common Member, Profit B Member or Management Member, as the case may be, upon such exercise of the Right of First Refusal and the concurrent purchase of such Common Units, Profit B Units or Management Units by the Lehman Parties, such Common Member, Profit B Member or Management Member shall thereafter not hold any rights under this Agreement as a Member and shall automatically be deemed to have withdrawn from the Company as a Member. If the Right of First Refusal is not exercised by the Lehman Parties, then during a period of 60 days after expiration of the 10 Trading Day notice period described above has passed, such Common Member, Profit B Member or Management Member may transfer all Units sought to be transferred as set forth in the Transfer Notice for the same price and otherwise upon the terms specified in the Transfer Notice.

(c) Tag-Along Right Upon Transfer by any Lehman Party.

(i)    Proposed Unit Sale. If any Lehman Party shall propose to Transfer Units in any one or series of transactions to any Tag-Along Unrelated Party, and any one of such proposed transfers to any such Tag-Along Unrelated Party would constitute, after giving cumulative effect to all such prior transfers by all Lehman Parties, a transfer of 20% or more of the Common Units owned by Lehman as of the date hereof (as adjusted to account for Unit splits or dividends, reverse or otherwise) (the *"Proposed Unit Sale"*), then the transferring Lehman Party shall provide written notice (the *"Proposed Unit Sale Notice"*) to the Company and each of the other Common Members by first class mail at least 30 days but no more than 60 days prior to such Proposed Unit Sale, which notice shall set forth all of the material terms and conditions of such Proposed Unit Sale, including the number of Membership Units to be sold in such Proposed Unit Sale and the price per Membership Unit to be paid in connection therewith. In the absence of an

exercise of the Drag-Along Right in accordance with Section 3.5(d) below, each such other Common Member shall have the right, but not the obligation (except as provided in Section 3.5(d)), to sell in such Proposed Unit Sale up to a percentage of Common Units (the *"Tag-Along Allotment"*) owned by it equal to the percentage that the Membership Units the transferring Lehman Party proposes to sell in such Proposed Unit Sale is of the aggregate number of the Membership Units owned of record by the Lehman Parties in the aggregate (the *"Tag-Along Right"*) by delivery of a written notice (the *"Tag-Along Notice"*) by first class mail to such effect to Lehman and the Company no later than 15 Trading Days after receipt of such written notice by such Common Member. Such Tag-Along Notice shall specify the number of Membership Units which such Common Member proposes to sell in connection with the Proposed Unit Sale, which shall not exceed such Common Member's Tag-Along Allotment. The Tag-Along Notice shall also specify the aggregate number of additional Common Units owned of record by such Common Member, if any, which such Common Member desires also to include in the Proposed Unit Sale (the *"Additional Units"*) in the event there is any under-subscription for the entire amount of any other Common Members' Tag-Along Allotments. The Tag-Along Notice given by each Common Member shall constitute such Common Member's binding agreement to sell the Common Units specified in such Tag-Along Notice (including any Additional Units to the extent such Additional Units are to be included in the Proposed Unit Sale) on the same terms and conditions applicable to the transferring Lehman Party in the Proposed Unit Sale. Each Common Member delivering such Tag-Along Notice shall deliver to Lehman such documents as may be reasonably requested by Lehman to effect such sale, subject to paragraph (ii) below. If the prospective purchaser in the Proposed Unit Sale is unwilling to purchase all the offered Membership Units, including those offered pursuant to the exercise of the Tag-Along Right, then the Lehman Parties and each other Common Member who exercised its Tag-Along Right shall be entitled to sell a number of Membership Units equal to (x) the number of Membership Units the prospective purchaser is willing to buy multiplied by (y) a fraction, the numerator of which is the number of Membership Units owned by such other Common Member or the Lehman Parties, as the case may be, as of the date of the Proposed Unit Sale, and the denominator of which is the sum of the total number of Membership Units owned by the Lehman Parties in the aggregate and all Common Members exercising their Tag-Along Rights as of such date. If any Common Member wishes to sell less than all the Membership Units it is entitled to sell in accordance with the preceding sentence, the Membership Units it declines to sell shall be allocated among the Lehman Parties and such of the other Common Members who have indicated a desire to sell Additional Units pursuant to a Tag-Along Notice according to the same formula, *mutatis mutandis.*

      (ii)    <u>Terms of Sale</u>. Any sales of Units by a Common Member as a result of the Tag-Along Rights provided under this Section 3.5(c) shall be on the same terms and conditions as the Proposed Unit Sale by the Transferring Lehman Party; <u>provided, however,</u> that no Common Member seeking to sell its Common Units in a Proposed Unit Sale shall be required to make representations and warranties other than with respect to title to such Common Member's Common Units and authority to enter into the relevant transaction. Notwithstanding the foregoing, the liability of any Common Member participating in any Proposed Unit Sale under any indemnity, holdback or similar arrangement shall be the same as that of the transferring Lehman Party (meaning, for the

avoidance of doubt, that such Common Member shall provide an indemnity, holdback or similar provision even with respect to representations and warranties that such Common Member is not required to make); provided, however, that the liability of any Common Member (other than the Lehman Parties) under any such indemnity, holdback or similar provision shall be several and not joint and shall be limited to the proceeds received by such Common Member in connection with the Proposed Unit Sale, other than the indemnity that relates to such Common Member's representations referred to in the proviso to the first sentence of this paragraph (ii), which shall not be so limited but shall instead be limited to the same extent as any limitation with respect to a similar indemnity given by the transferring Lehman Party.

(iii)    Reset of Tag-Along Rights.  If a Tag-Along Notice is not received by Lehman from any Common Member within the 15-Trading Day period specified in Section 3.5(c)(i) above, the transferring Lehman Party shall have the right to sell or otherwise transfer the number of Units specified in the Proposed Unit Sale Notice to the proposed purchaser or transferee without any participation by such Common Member, but only if such Proposed Unit Sale occurs on a date within 90 days after the Proposed Unit Sale Notice and only on such terms and conditions no more favorable to the transferring Lehman Party than those stated in the Proposed Unit Sale Notice.  If such Proposed Unit Sale does not occur within such 90-day period, the Units that were to be subject to such Proposed Unit Sale thereafter shall continue to be subject to all of the provisions of this Section 3.5(c).

(iv)    Follow-on Tag-Along Rights.  In the event that 25% or more of the value of the consideration being offered by the purchaser in any Proposed Unit Sale consists of the securities of any Person who, as a result of such Proposed Unit Sale, becomes an Affiliate of the transferring Lehman Party in such Proposed Unit Sale, then the terms and provisions of this Section 3.5(c) shall continue to apply with respect to such securities as if such securities constituted Units hereunder; provided, however, that this clause (iv) shall (A) not apply to any non-cash consideration which constitutes Marketable Securities which the holder thereof is entitled to sell immediately to the general public pursuant to a then effective registration statement or Rule 144(k) under the Securities Act; and (B) terminate with respect to a Common Member on the date that the applicable Common Member which received such non-cash consideration as consideration in such Proposed Unit Sale disposes of such securities or otherwise transfers such securities to a Person who is not an Affiliate of such Common Member.

(v)    Oaktree Alternative.  Notwithstanding the foregoing, in lieu of Oaktree's right to participate in any Proposed Unit Sale and sell Common Units, at Oaktree's option, Oaktree shall have the right to require the proposed purchaser to purchase Oaktree Shares from Oaktree's shareholder.  In the event that Oaktree exercises this right, (A) the number of Oaktree Shares to be acquired by the purchaser shall bear the same proportion to the aggregate outstanding Oaktree Shares as the number of Units that would otherwise have been sold by Oaktree pursuant to Section 3.5(c)(i) above bears to the total number of Units held by Oaktree, (B) the price to be paid by the purchaser for such Oaktree Shares shall be the same as the price that otherwise would have been paid for Oaktree's corresponding Units pursuant to this Section 3.5(c), and (C) Oaktree's parent and/or

Oaktree shall be required to make representations and warranties relating to Oaktree customarily made in transactions of such type with respect to organization, capitalization (including title to Oaktree shares), authorization, no conflict, no undisclosed liabilities and no operations (other than holding of Common Units).

(d) Drag-Along Right.

(i)    Acquisition Proposal.  If any Lehman Party shall receive a bona fide arms' length offer in writing from any Person that is not a Lehman Party or the Company or any of its Affiliates (a "Drag-Along Unrelated Party") to purchase Units in an amount equal to or greater than 75% of the Units then owned by the Lehman Parties in the aggregate (an "Acquisition Proposal"), then Lehman shall have the right (the "Drag-Along Right") to cause the other Members other than Phoenix Investors (each, a "Drag-Along Seller") to sell a pro rata portion of the Units (including Common Units, Profit B Units and Management Units, whether vested or unvested) on an as converted basis owned by each of them by providing written notice of its exercise of such Drag-Along Right not more than 60 nor less than 20 days prior to the consummation of such purchase of Units to all of the Drag-Along Sellers and to the Drag-Along Unrelated Party.  In such event, each of the Drag-Along Sellers agrees to (x) vote all of the Common Units or Profit B Units beneficially owned by such Member in favor of such Acquisition Proposal and to take all other commercially reasonable steps to cause the approval of such Acquisition Proposal and (y) sell to the Drag-Along Unrelated Party a pro rata portion on an as converted basis (in accordance with the following sentence) of the Units held by such Drag-Along Seller at the equivalent purchase price per Unit and otherwise on the same terms and conditions as the transferring Lehman Party shall receive on its sale of its Units to the Drag-Along Unrelated Party pursuant to the Acquisition Proposal (the "Drag-Along Sale").  The number of Units to be sold by each Drag-Along Seller shall be equal to the product of (x) the total number of Units then owned by such Drag-Along Seller, multiplied by (y) a fraction, the numerator of which is the number of Units to be sold by the transferring Lehman Party to the Drag-Along Unrelated Party and the denominator of which is the total number of Units then owned by the Lehman Parties in the aggregate.  If different classes of Units are included in any such Drag-Along Sale, the consideration to be paid in connection with the Drag-Along Sale shall be allocated among each Unit based upon the relative Fair Market Value of each such Unit in accordance with the terms of this Agreement.

(ii)    Terms of Sale.  No Common Member or Profit B Member selling its Common Units or Profit B Units in a Drag-Along Sale shall be required to make representations and warranties other than with respect to title to such Common Member's Common Units or to such Profit B Member's Profit B Units and authority to enter into the relevant transaction.  Notwithstanding the foregoing, the liability of any Common Member or Profit B Member participating in any Drag-Along Sale under any indemnity, holdback or similar arrangement shall be the same as that of the transferring Lehman Party (meaning, for the avoidance of doubt, that such Common Member or Profit B Member shall provide an indemnity, holdback or similar provision even with respect to representations and warranties that such Common Member or Profit B Member is not required to make); provided, however, that the liability of any Common Member or Profit

B Member (other than the Lehman Parties) under any such indemnity, holdback or similar provision shall be several and not joint and shall be limited to the proceeds received by such Common Member or Profit B Member in connection with the Drag-Along Sale, other than the indemnity that relates to such Common Member's or Profit B Member's representations referred to in the first sentence of this paragraph (ii), which shall not be so limited but shall be instead limited to the same extent as any limitation with respect to a similar indemnity given by the transferring Lehman Party.

(iii)    Follow-on Tag-Along Rights. In the event that 25% or more of the value of the consideration being offered by the purchaser in any Acquisition Proposal consists of the securities of any Person who, as a result of the consummation of such Acquisition Proposal, becomes an Affiliate of the transferring Lehman Party upon the consummation of such Acquisition Proposal, then the terms and provisions of Section 3.5(c) shall continue to apply with respect to such securities as if such securities constituted Units hereunder; provided, however, that this clause (iii) shall (A) not apply to any non-cash consideration which constitutes Marketable Securities which the holder thereof is entitled to sell immediately to the general public pursuant to a then effective registration statement or Rule 144(k) under the Securities Act; and (B) terminate with respect to a Common Member or Profit B Member on the date that the applicable Common Member or Profit B Member which received such non-cash consideration as consideration in such Drag-Along Sale disposes of such securities or otherwise transfers such securities to a Person who is not an Affiliate of such Common Member or Profit B Member.

(iv)    Certain Restrictions. Notwithstanding anything in this Agreement to the contrary, none of the Company or any Member shall effect or participate in any transaction in which (a) all or substantially all of the Company's assets, determined on a consolidated basis, are sold, (b) Common Units representing a majority in interest of the then outstanding Common Units are sold (including pursuant to a Drag-Along Sale) to Persons other than Permitted Transferees, or (c) the Company merges or consolidates with another Person, unless (i) in the case of each of clauses (a), (b) and (c), Oaktree has given its prior written approval to any such transaction, or (ii) (x) in the case of a transaction described in clause (a) above, Oaktree is given the right to sell or transfer all of the Oaktree Stock to the Company (prior to or at the time of such asset sale) for the same consideration that Oaktree would have received upon a distribution of all of the assets of the Company to the Members immediately following such asset sale, (y) in the case of a transaction described in clause (b), in lieu of the sale or transfer by Oaktree of its Units, Oaktree is given the right to sell or transfer to the purchaser, for the same consideration Oaktree would have received with respect to the sale of the Units that Oaktree otherwise would have sold in such transaction, a number of Oaktree Shares equal to (1) the total number of Oaktree Shares multiplied by (2) a fraction, the numerator of which is equal to the number of Units that would have been sold by Oaktree in such transaction, and the denominator of which is equal to all of the then outstanding Units held by Oaktree, or (z) in the case of a transaction described in clause (c), in lieu of the exchange or transfer by Oaktree of its Units, Oaktree is given the right to exchange or transfer all of the Oaktree Shares for the same consideration it would have received for the exchange or transfer of all of its Units in such a transaction; provided, however, in the case of clauses (x), (y) and (z) of this Section 3.5(d)(iv), that Oaktree's parent and/or

Oaktree complies with the requirements with respect to representations and warranties set forth in Section 3.5(c)(v)(C) as may be applicable to such transactions.

(e) Preemptive Rights.

     (i)    In the event that the Company proposes to issue any New Units, each Common Member shall have the right to purchase, in accordance with Section 3.5(e)(ii) below, a number of New Units equal to the product of (A) the total number or amount of New Units which the Company proposes to issue at such time and (B) a fraction, the numerator of which shall be the total number of Common Units which such Common Member owns at such time, and the denominator of which shall be the total number of the then outstanding Common Units. The rights given by the Company under this Section 3.5(e) with respect to each such issuance of New Units shall terminate with respect to such issuance if unexercised within 30 days after receipt of the Notice of Issuance referred to in Section 3.5(e)(ii) below.

     (ii)    In the event that the Company proposes to undertake an issuance of New Units, it shall give written notice (a *"Notice of Issuance"*) of its intention to each Common Member, describing all material terms of such New Units, the price and all material terms upon which the Company proposes to issue such New Units. Each Common Member shall have 30 days from the date of the Notice of Issuance to agree to purchase all or any portion of its pro rata share of such New Units (as determined pursuant to Section 3.5(e)(i) above) for the same price as set forth in the Notice of Issuance, and otherwise upon the terms specified in the Notice of Issuance by giving written notice to the Company, and stating therein the quantity of New Units to be purchased by such Member which shall not be greater than its pro rata share of such New Units.

     (iii)    The Company and each Member electing to purchase the New Units to be sold by the Company shall select a date not later than 20 days (or longer if required by law) after the expiration of the 30-day notice period referenced in Section 3.5(e)(ii) for the closing of the purchase and sale of the New Units. In the event any purchase by an electing Member is not consummated, other than as a result of the fault of the Company, within the provided time period, the Company may, within 60 days after the expiration of the 30-day notice period referenced in Section 3.5(e)(ii) for the closing of the purchase and sale of the New Units, issue the New Units free and clear from the other restrictions of this Section 3.5(e) provided that such issuance shall be on terms and conditions no less favorable to the Company than those offered to the Common Members.

(f) Notwithstanding the other provisions of this Section 3.5, no transfer of Membership Units or other interests in the Company shall be recognized (and any such attempted transfer shall be void *ab initio*) if such transfer would cause the Company to become a publicly traded partnership (as defined in Code Sections 469(k)(2) or 7704(b)). The Board of Managers, in its sole discretion, may require the transferor and/or transferee in such case to deliver an opinion of counsel, which opinion and counsel are reasonably satisfactory to the Board of Managers, substantially to such effect.

3.6.    **Restrictions on Transactions Between the Company and the Common Members or Their Affiliates.**

No transaction between the Company or any of its Subsidiaries, on the one hand, and any Common Member or its Affiliates (other than the Company and its Subsidiaries), on the other hand, shall be entered into or conducted, and no material terms thereof shall be changed or waived, unless the terms of such transaction or any such proposed change or waiver are disclosed to each of the Common Members not involved in such transaction and are approved by such uninvolved Common Members who hold in the aggregate at least 75% of the then outstanding Common Units (whether directly or through an Affiliate); provided that (a) no such approval hereunder shall be required with respect to:

(i)    transactions with any Common Member or its Affiliates that are on terms that are at least as favorable to the Company or the relevant Subsidiary as could have been obtained in a comparable arm's length transaction with a Person that is not a Common Member or one of its Affiliates (it being understood that any unanimous determination by the Board of Managers that a transaction satisfies this clause (i) shall be conclusive);

(ii)    distributions permitted hereunder;

(iii)    guarantees of obligations to third parties in connection with relocation of employees of the Company or any Subsidiary;

(iv)    employment agreements, non-competition agreements, stock purchase or option agreements, collective bargaining agreements, employee benefit plans or arrangements (including vacation plans, health and life insurance plans, deferred compensation plans, stock loan plans, directors' and officers' indemnification agreements and retirement, savings or similar plans), related trust agreements or any similar arrangements, in each case in respect of employees, officers or directors and entered into in the ordinary course of business, any payments or other transactions contemplated by any of the foregoing and any other payments of compensation to employees, officers or directors in the ordinary course of business;

(v)    transactions contemplated by an agreement in effect on the date hereof, including this Agreement, as set forth in Schedule 3.6(a) attached hereto; and

(vi)    cash payments of a reasonable management or service fee to Lehman Brothers, Inc. or its Affiliates;

and (b) if financing on commercially reasonable terms under the circumstances then prevailing is not available on a timely basis from a third party, the Company or any of its Subsidiaries may borrow funds from any Common Member or its Affiliates (an "*Affiliate Financing*"), and no such approval shall be required as to the lender (the "*Affiliate Lender*") or the terms of such borrowing; provided, however, that so long as Lehman, Oaktree and Phoenix Investors or their Permitted Transferees are Common Members, each of Lehman, Oaktree and Phoenix Investors, respectively, shall have the right (but not the obligation) to participate in such financing on a pro rata basis according to such Member's Percentage Interest on the same terms as the Affiliate

Lender (the "*Financing Participation Right*"). The Affiliate Lender shall provide written notice of such Affiliate Financing and a description of the terms and conditions thereof to the Common Members as of the close of such Affiliate Financing, and any Member desiring to exercise its Financing Participation Right shall do so by delivering a written commitment to the Affiliate Lender no later than thirty Trading Days following the closing of such Affiliate Financing. Within a commercially reasonable period of time, the Affiliate Lender shall then transfer, upon payment therefor, the appropriate portion of such Affiliate Financing to the Member exercising such Financing Participation Right.

3.7.    **Liability to Third Parties.**

No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or order of a court.

3.8.    **Withdrawal.**

A Member does not have the right or power to withdraw from the Company as a Member except as otherwise set forth specifically herein; provided, however, that the Board of Managers may approve the withdrawal of any Member solely in connection with the surrender by such Member of 100% of such Member's Units to the Company for nominal or no consideration and the immediate extinguishment of such Member's Units.

3.9.    **Conversion into a Corporation or Other Entity.**

In the event that the Board of Managers for any reason determines to convert the Company, through continuance or otherwise, into a corporation or other organizational form, the Company shall take and shall cause others to take all steps necessary for (a) the Company to be converted in such manner as designated by the Board of Managers in consultation with counsel to the Company; provided, however, that all Members shall be treated as consistently as practicable in a commercially reasonable manner with their relative rights hereunder as Members, retaining the powers, designations, preferences, rights, qualifications, limitations and restrictions of their Units to the extent practicable and commercially reasonable given the business purpose for the conversion and as provided for in this Agreement as determined by the Board of Managers and (b) such successor corporation or entity to assume all of the obligations of the Company, including those under this Agreement, the Registration Rights Agreement and the Witkoff Option Agreement. At the discretion of the Board of Managers, the Management Units and the Profit B Units may be converted into a number of Common Units at a conversion ratio that reflects their relative Fair Market Value. Upon such determination by the Board of Managers, all Members agree to cooperate in the full and timely implementation of such conversion. The Company shall use its commercially reasonable efforts to structure the conversion in the most tax efficient manner. At or prior to any such conversion, the Members agree to enter into a stockholders agreement or other agreement containing provisions substantially similar to those contained in this Agreement.

3.10.    **Tolling.**

All time periods specified in this Article 3 are subject to reasonable extension for the purposes of complying with Requirements of Law or Regulation.

80280982_23.DOC                      19

# ARTICLE 4
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

### 4.1.    Capital Contributions.

Contemporaneously with the execution of this Agreement, each Member shall make or shall have made the Capital Contributions described for that Member in Exhibit A attached hereto and as of the date hereof shall have a Capital Account balance as reflected therein.

### 4.2.    Return of Contributions.

Except as otherwise provided in this Agreement, a Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

### 4.3.    Capital Accounts.

(a) A separate Capital Account shall be maintained for each Member. The Capital Account of each Member as of the date hereof shall be as reflected in Exhibit A attached hereto. Each Member's Capital Account (i) shall be increased by (A) the amount of any cash or the Fair Market Value of any property (net of any liabilities of the Member assumed by the Company or secured by such property that the Company is considered to assume or take subject to in accordance with Code Section 752) contributed by the Member to the Company and (B) the amount of Profits (or items thereof) allocated to the Member's Capital Account in accordance with Section 5.1; and (ii) shall be decreased by (A) the amount of any cash or the Fair Market Value of any property (net of any liabilities of the Company assumed by the Member or secured by such property that the Member is considered to assume or take subject to in accordance with Code Section 752) distributed to the Member by the Company and (B) the amount of Losses (or items thereof) allocated to the Member's Capital Account in accordance with Section 5.1. Upon conversion of a Profit B Unit to a Common Unit, the Capital Account of the Member shall equal such Member's pro rata share of the fair market value of the net assets of the Company.

(b) The Capital Account established for any Member who acquires Units by virtue of a Transfer shall be in the same amount as, and shall replace, the Capital Account of the transferor of such Units, and for purposes of this Agreement such transferee Member shall be deemed to have made the Capital Contributions made by the transferor of such Units. To the extent such transferee Member acquires less than all of the Units of the transferor, the Capital Account of such transferee Member and its Capital Contributions shall be in proportion to the Units it acquires, and the Capital Account of the transferor and the amount of its Capital Contributions shall be reduced in proportion to the Units it transfers.

(c) The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the Regulations under Code Section 704(b) and shall be interpreted and applied in a manner consistent therewith. Upon the occurrence of any event specified in Regulations Section 1.704-1(b)(2)(iv)(f), the conversion of a Profit B Unit or the issuance of a Management Unit, the Tax Matters Member may cause the Capital Accounts of the Members to

be adjusted to reflect the Fair Market Value of the Company assets at such time in accordance with such Regulations; provided, however, that the Tax Matters Member shall cause the Capital Accounts of the Members to be so adjusted at the time of the admission of any new Member.

(d) If Units are issued pursuant to the exercise of an option, warrant or other convertible equity interest issued by the Company, the Capital Account of the exercising Person shall reflect not only the cash or property contributed by such Person, but also any excess of the Fair Market Value as of the date of exercise of such Person's proportionate share of the Company's assets over such contribution (and the Capital Accounts of the Members shall be adjusted in accordance with Proposed Regulations Section 1.704-1(b)(2)(iv)(s)).

### 4.4.    Additional Capital Contributions.

Except as provided in Section 4.1, no Member shall have any obligation to make any additional Capital Contributions.

**ARTICLE 5**
**ALLOCATIONS, DISTRIBUTIONS, AND WITHHOLDING**

### 5.1.    Allocations.

(a) Allocations of Profits and Losses.

(i)    Except as otherwise provided in this Agreement, for tax purposes, Profits and Losses for each Fiscal Year (or portion thereof) shall, after giving effect to all Capital Account adjustments attributable to the Capital Contributions and distributions made with respect to such Fiscal Year (or portion thereof), be allocated among the Members in a manner such that, as of the end of such Fiscal Year (or portion thereof) and taking into account all prior allocations of Profits and Losses and all distributions made to the Members through such date, the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to the distributions that would be made to such Member pursuant to Section 10.2 if the Company were dissolved, its affairs wound up and assets sold for cash equal to their book values, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the book values of the assets securing such liability), and the net assets of the Company were distributed in accordance with Section 10.2; provided, however, that the Losses allocated to a Member shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have a negative Capital Account balance at the end of any Fiscal Year.

(ii)    Subject to the foregoing, in the event that Members are admitted to the Company on different dates, the Profits and Losses allocated to the Members for each Fiscal Year during which Members are so admitted shall be allocated among the Members in proportion to the number of Units each holds from time to time during such Fiscal Year in accordance with Code Section 706, using any convention permitted by law and selected by the Tax Matters Member.

(b) <u>Special Allocations</u>. This Section 5.1 is intended to comply, and the Board of Managers shall interpret Section 5.1 consistently therewith, with the regulatory allocations of Regulations Section 1.704-2. In the event that the Company incurs nonrecourse liabilities within the meaning of Regulations Section 1.704-2, the Company shall make special allocations of minimum gain chargeback and partner minimum gain chargeback as required to comply with such Regulations.

(c) The Members intend that all items of income, gain, loss and deduction as determined for federal, state and local tax purposes shall be allocated in accordance with this Section 5.1 to the fullest extent permitted by Code Section 704(b) and taking into account any variation between the adjusted tax basis and book value of the Company's property in accordance with the principles of Code Section 704(c) and the Regulations promulgated thereunder. In the event that the Company is advised that such allocations will not be respected for federal income tax purposes, the allocation provisions of this Agreement shall be amended in the manner to maintain as close as possible the allocation intended and that the Board of Managers reasonably determines to be in the best interest of the Members. All decisions and elections affecting the determination and allocation of the Company's Profits and Losses (or any items thereof) shall be made by the Board of Managers in its reasonable discretion and shall be binding on all Members.

(d) A Member who unexpectedly receives any adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit Capital Account balance as promptly as possible. For purposes of determining the Capital Account deficit of a Member for purposes of this Section 5.1(d), the balance of such Member's Capital Account shall be computed taking into account the adjustments required or permitted by Regulations Section 1.704-1(b)(2)(ii)(d).

5.2.    Distributions.

(a) Subject to any Third Party Restrictions, all distributions (other than (i) tax distributions described in Section 5.2(b) and (ii) distributions with respect to dissolution described in Section 10.2) shall be made at such time or times as determined by the Board of Managers in the exercise of its sole discretion. Subject to the foregoing, (1) no distributions of any kind (including without limitation operating distributions and distributions with respect to a sale of any portion of the Company's assets or business), other than tax distributions pursuant to Section 5.2(b), shall be made by the Company with respect to (x) the Profit B Units and the Management Units unless prior thereto the holders of the Common Units shall have received an aggregate amount equal to such holders' Capital Contributions in respect of such Common Units and (y) the Common Units in excess of the distributions described in (x) and the Management Units unless prior thereto the holders of the Profit B Units shall have received an aggregate amount equal to $1,000 per Profit B Unit, and (2) to the extent Management Units are issued on more than one date, all Membership Units issued before such date and outstanding as of such date shall be entitled to a distribution preference in an aggregate amount (without duplication) equal to the Capital Account balance (taking into account adjustments resulting from the issuance of the new Units) as of such date. Subsequent distributions shall be made *pari passu* to Common Units, Profit B Units and Management Units. All distributions shall be made pro rata,

based on the number of Units held, among the holders of the class or classes of Units entitled to distribution.

(b) Subject to Section 5.2(a) above, the Company shall, as soon as practicable after the close of each Fiscal Year, make pro rata cash distributions to all Members, regardless of their tax status, in amounts intended to enable each such Member (or, in the case of a Member that is a flow-through entity, the direct or indirect owners of such Member) to discharge its aggregate federal, state and local income tax liability (computed at the highest marginal federal, state and local tax rates applicable to such Member and taking into account the deductibility of state and local income taxes for U.S. federal income tax purposes) arising from the allocations of Company taxable income made to them pursuant to Section 5.1 for such Fiscal Year. Such distributions shall be treated as non-interest bearing advances recoverable from current or future distributions pursuant to Section 10.2.

(c) In the case of any Management Member who holds unvested Management Units, the amounts otherwise distributable with respect to such unvested Management Units (other than any tax distributions paid thereto) shall be set aside for such Management Member until such Management Units vest, at which time such amounts shall be distributed to such Management Member in accordance with the procedures set forth in this Section 5.2. In the event that such Management Units fail to vest, the amounts that would have otherwise been distributable with respect thereto shall be re-apportioned and distributed among the remaining Membership Units in accordance with this Section 5.2.

(d) Notwithstanding anything contained herein to the contrary, the Company shall not make any distribution to a Member with respect to such Member's Units if such distribution would violate Section 18-607 of the Act or other Requirements of Law.

5.3.    **Withholding.**

Each Member recognizes that the Company or any of its Affiliates may be obligated by the Requirements of Law to withhold and pay over, or otherwise pay, taxes with respect to such Member or as a result of such Member's participation in the Company. To the extent the Company shall be required to withhold any such tax with respect to any such Member, such Member shall be deemed for all purposes of this Agreement to have received a distribution with respect to such Member's interest in the amount of such tax upon the earliest to occur of (i) the day on which the tax is withheld or paid, (ii) the last day of the Company's taxable year for which such tax is withheld or paid, (iii) the last day on which such Member owned its interest or (iv) the day specified by the Requirements of Law as constituting a deemed distribution for tax purposes.

## ARTICLE 6
### BOARD OF MANAGERS; MEETINGS OF MEMBERS;
### CONFLICTS OF INTEREST

6.1.    **Board of Managers.**

(a) Except as otherwise expressly provided herein and except to the extent reserved to the Members in the Certificate or the Act, the Board of Managers shall have exclusive authority to

manage the operations and affairs of the Company and to make all decisions regarding the business of the Company. It is understood and agreed that the Board of Managers shall have all of the rights and powers of a manager as provided in the Act and as otherwise provided by the Requirements of Law, and any action taken by the Board of Managers or its authorized agent or agents shall constitute the act of and serve to bind the Company.

(b) The Board of Managers may appoint such Persons as it in its sole discretion deems necessary and appropriate to perform its duties hereunder and may designate such Persons as managers or officers of the Company. In connection with the foregoing, the Members hereby appoint and authorize Mark Landry and Sanjiv Mehra to sign checks, authorize wire transfers and make any other payments on behalf of the Company; provided, however, that any such payments made on behalf of the Company shall require the signatures of at least two of the foregoing authorized persons; provided, further, that such authorized persons may be changed at any time and from time to time by the Board of Managers. The Board of Managers may at any time and from time to time to establish and maintain committees thereof (a *"Board Committee"*) as it in its sole discretion deems desirable and appropriate, and may delegate its authority and duties thereto.

(c) The Board of Managers of the Company shall consist of no less than three and no more than nine natural Persons, one of whom shall be designated by Phoenix Investors and the remaining of whom shall be designated by the Lehman Parties. The initial Board of Managers shall be composed of:

Daniel James, Josh Collins, Mark Landry, and Steve Witkoff.

Steve Witkoff shall be the designee of Phoenix Investors to the Board of Managers until his resignation or earlier removal in accordance herein.

(d) To the extent Oaktree continues to hold 100% of the Common Units it holds as of the date hereof, Oaktree shall have the right to appoint a representative (the *"Observer"*), who shall be reasonably acceptable to the Company, to attend and participate in all meetings of the Company's Board of Managers and all Board Committees, except for meetings of the Company's Board Committee on compensation, whether in person or by video- or tele-conferencing, in an exclusively observer capacity. The Company will provide to the Observer, concurrently with the members of the Board of Managers, and in the same manner, notice of such meetings and a copy of all minutes, consents and other materials provided to members of the Board of Managers. The Observer shall not constitute a member of the Board of Managers and shall not be entitled to vote on any matters presented at meetings of the Board of Managers or to consent to any matter as to which the Company shall have requested the consent of the Board of Managers. Notwithstanding any provision of this Agreement to the contrary, the Observer shall not be privy to any information of the Company protected by law as a privileged communication resulting from a protected relationship (including, by way of example, the attorney-client relationship), so long as such information remains privileged and the disclosure to the Observer of such information would in the good faith judgment of the Company constitute a waiver of such privileged status.

(e) Regular meetings of the Board of Managers or any Board Committee may be held on a quarterly or more frequent basis, at times and at locations determined by the Board of Managers; provided, however, that the Board of Managers shall meet at least one time during the period from the date of this Agreement through June 30, 2005 and at least four times per calendar year thereafter. A special meeting of the Board of Managers or any Board Committee may be called for any purpose at any time by any two Managers. Meetings of the Board of Managers or any Board Committee may be held at such places, within or without the State of Delaware, as may from time to time be designated by the Board of Managers or by the Managers calling a special meeting. Managers may participate in meetings in person or by video- or tele-conferencing, so long as such methods permit each Manager attending such meeting to hear the others.

(f) No action may be taken at a meeting of the Board of Managers unless a simple majority of the Managers is present in person or by video- or tele-conference, or, in the case of a meeting of any Board Committee, unless a simple majority of the members of such Board Committee is present. Any action approved by a majority of the Managers or by a majority of the members of any Board Committee, whether at a duly-called meeting or by written consent, shall be deemed to be an action of the Board of Managers or such Board Committee, as applicable. Each Manager and each member of any Board Committee, as applicable, shall have one vote.

(g) Any Manager may be removed, for any reason or no reason, by the Founding Member; provided, however, that so long as Steve Witkoff is the designee of Phoenix Investors, only Phoenix Investors shall have the right to remove such Manager for any reason or no reason. In the event that Steve Witkoff is no longer the designee of Phoenix Investors, the Manager appointed by Phoenix Investors pursuant to Section 6.1(c) may be removed for cause by a vote of the majority of the then remaining Managers.

(h) Any Manager or any member of any Board Committee may resign for any reason by giving written notice to the Board of Managers. The resignation of a Manager or a member of any Board Committee shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(i) Any vacancy on the Board of Managers occurring for any reason shall be promptly filled by the Founding Member, except that the seat of the Manager to be appointed by Phoenix Investors pursuant to Section 6.1(c) shall remain vacant unless filled by Phoenix Investors.

(j) No Manager and no member of any Board Committee shall receive any compensation for its services. Each Manager, each member of any Board Committee and the Observer shall be entitled to be reimbursed for reasonable out-of-pocket costs and expenses incurred in the course of its services hereunder.

6.2.    **Meetings of Members.**

(a) Subject to the Requirements of Law, meetings of the Members of the Company shall be held at such time, date and place as may be determined from time to time by the Founding

Member, other than the place of annual meetings, which shall be determined by the Board of Managers in accordance with Section 6.2(b).

(b) All meetings of the Members of the Company shall be held at such places, within or without the State of Delaware, as may from time to time be designated by the Board of Managers, in the case of annual meetings, or by the Founding Member, and specified in the respective notices or waivers of notice thereof. Members may participate in the meetings in person or by video- or tele-conferencing, so long as such methods permit each Member attending such meeting to hear the others.

(c) The presence at a meeting, in person or by proxy, of a majority in interest of Members entitled to vote on the matter or matters to be considered at such meeting, constitutes a quorum for the transaction of business required. When a quorum is present, the affirmative vote, in person or by proxy, of a majority in interest of Members present in person or by proxy entitled to vote on the subject matter shall be the act of the Members, unless the vote of a greater proportion or number or voting by classes is required by the Act.

(d) Any action required or permitted to be taken at any meeting of the Members may be taken without a meeting if Members holding not less than the minimum number of Units that would be necessary to approve the action pursuant to the terms of this Agreement, consent thereto in writing. Written consent by the Members pursuant to this Section 6.2(d) shall have the same force and effect as a vote of such Members taken at a duly held meeting of the Members and may be stated as such in any document.

(e) The Members may not resign or withdraw from the Company prior to the dissolution and winding up of the Company, except pursuant to Section 3.8 or in connection with a Transfer of all of such Member's Units pursuant to the terms of this Agreement; provided, however, that a Member shall cease to be a Member upon the occurrence of any event described in Section 18-304 of the Act. A resigning Member shall not be entitled to receive any distribution and shall not otherwise be entitled to receive the Fair Market Value of such Member's Units, unless otherwise set forth herein or determined by the Board of Managers.

(f) Except as otherwise set forth in the Requirements of Law, notice of each meeting of the Members of the Company shall be given not less than ten nor more than twenty days before the date of the meeting to each Member of record entitled to vote at such meeting by delivering a typewritten or printed notice thereof to such Member personally, by depositing such notice in the United States mail in a postage prepaid envelope, direct to such Member at the post office address furnished by the Member to the Company, or by facsimile or electronic mail provided confirmation of delivery is received.

(g) When any notice is required to be given to any Member of the Company under the provisions of this Agreement, a waiver thereof in writing signed by the Person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice. By attending a meeting, a Member (i) waives objection to lack of notice or defective notice of such meeting unless the Member, at the beginning of the meeting, objects to the holding of the meeting or the transacting of business at the meeting; and (ii) waives objection to consideration at such meeting of a particular matter not within the purpose or purposes

described in the meeting notice unless the Member objects to considering the matter when it is presented.

**6.3.    Veto Rights of Certain Common Members.**

For so long as each of Lehman and Phoenix Investors owns more than 50% of the Membership Units owned by such party as of the date hereof (adjusted to account for equity splits or dividends, reverse or otherwise), each of Lehman and Phoenix Investors, respectively, shall be entitled to veto the following actions of the Company or any of its Subsidiaries:

(i)     amending, supplementing, modifying, terminating or waiving any provision of the certificate of formation of the Company or this Agreement;

(ii)    authorizing, creating or modifying any of the terms of any Membership Units;

(iii)   voluntarily liquidating, dissolving or winding up the Company, any reorganizing of the Company into a corporate Person which is not treated as a partnership for federal income tax purposes, or voluntarily commencing of a proceeding under the federal bankruptcy law;

(iv)    declaring or paying any dividends or making any distributions upon any of its Membership Units;

(v)     redeeming, purchasing or otherwise acquiring or repurchasing any of the Membership Units (other than repurchasing any of the Management Units in accordance with the terms set forth in Exhibit B hereto);

(vi)    entering into any debt financing transaction;

(vii)   acquiring or disposing of, in a single transaction or a series of related transactions, any business or assets with an aggregate value in excess of $5 million;

(viii)  adopting the annual operating budget;

(ix)    entering into any material contracts, or materially changing any existing material contracts;

(x)     instituting a fundamental change in the business of the Company from that existing as of the date hereof;

(xi)    entering into any agreement, commitment or arrangement with any of its officers, Managers, Members, or their respective Affiliates; which is material to the Company and its Subsidiaries, taken as a whole;

(xii)   hiring or terminating the executive officers of the Company; or

(xiii) setting the annual compensation for the executive officers of the Company.

### 6.4. Conflicts of Interest.

Subject to the other express provisions of this Agreement, each Manager and each Member of the Company at any time and from time to time may engage in and possess interests in other business ventures of any and every type and description, independently or with others, including those in competition with the Company, with no obligation to offer to the Company, any Manager or any other Member or officer the right to participate therein; provided, however, any Manager or any Member who is also an employee of the Company or any of its Subsidiaries shall not engage in any other business ventures of any type and description, independently or with others, that are in competition with the Company or any of its Subsidiaries without the express written approval of the Board of Managers.

## ARTICLE 7
## INDEMNIFICATION

### 7.1. Indemnification.

The Company shall indemnify each Manager for any act performed or failure to perform with respect to Company matters, in each case in good faith by such Manager, in its capacity as a Manager, to the fullest extent permitted by the Act other than for acts for which a Manager is liable to the Company as a result of fraud, gross negligence, willful misconduct, or an intentional breach of this Agreement or *ultra vires* acts.

## ARTICLE 8
## TAX MATTERS

### 8.1. Tax Returns.

The Company shall timely cause to be prepared all federal, state, local and foreign tax returns (including information returns) of the Company which may be required by a jurisdiction in which the Company operates or conducts business for each taxable period for which tax returns are required to be filed and shall cause such tax returns to be timely filed. The Company shall provide each Member such information (including a copy of such Member's federal income tax Schedule K-1 for each Fiscal Year) as is reasonably required by such Member to file any required federal, state, local and foreign tax returns.

### 8.2. Tax Elections.

Subject to Section 8.3, all elections permitted to be made by the Company under federal, state or local tax laws shall be made by the Tax Matters Member in its sole discretion.

### 8.3.    Treatment as Partnership.

The Members intend that the Company be treated as a partnership for U.S. federal income tax purposes. Accordingly, no member shall file any election on behalf of the Company, or take any action, that is inconsistent with that intent.

### 8.4.    Designation of Tax Matters Member.

Lehman shall be the "Tax Matters Member" of the Company, within the meaning of Section 6231(a)(7) of the Code, and shall manage all administrative and judicial proceedings conducted with respect to the Company by the Internal Revenue Service or other taxing authorities. All reasonable expenses incurred by Lehman while acting in such capacity shall be paid or reimbursed by the Company. Each Member hereby consents to such designation and agrees that upon the request of such Tax Matters Member (or successor Tax Matters Member) it will execute, certify, acknowledge, deliver, swear to, file and record, at the appropriate public offices such documents as may be necessary or appropriate to evidence such consent.

### ARTICLE 9
### BOOKS AND RECORDS; INFORMATION RIGHTS OF
### MEMBERS; BANK ACCOUNTS

### 9.1.    Maintenance of Books and Records.

The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members. The books of account for the Company shall be maintained in accordance with the terms of this Agreement, except that the Capital Accounts of the Members shall be maintained in accordance with Section 4.3.

### 9.2.    Information and Related Rights of Members.

(a) Each Member shall receive (i) as soon as available, but in any event not later than 120 days after the close of the fiscal year ending December 31, 2004 and ninety days after the close of each fiscal year thereafter, regularly prepared annual audited consolidated financial statements of the Company and its consolidated Subsidiaries accompanied by a report and an opinion of independent certified public accountants of national reputation; (ii) as soon as available, but in any event not later than 45 days (or during the period when the Transitional Services Agreement (as defined in the Securities Purchase Agreement) is in place, 55 days) after the end of each fiscal quarter of the Company, regularly prepared unaudited consolidated financial statements of the Company and its consolidated Subsidiaries as of such quarter and the portion of the fiscal year through the end of such quarter, accompanied by a certification of the chief financial officer, principal accounting officer, treasurer or comptroller of the Company with respect thereto, (iii) as soon as available, but in any event not later than 30 days after the close of any fiscal year, a budget for such current fiscal year which has been approved by the Company's Board of Managers (to include consolidated balance sheets and statements of cash flow and consolidated statements of income and expenses) for the Company and its Subsidiaries on a consolidated basis as at the end of and for each month of such fiscal year together with annual projections for each of the following two fiscal years (iv) reports with respect to gross product sales and actual returns based on the sales systems reports and estimated media costs based on

internal management reports, in each case for each month in reasonable detail; (v) a narrative discussion and analysis of the financial condition and results of operations of the Company on a quarterly basis for such year-to-date period; and (vi) with reasonable promptness, such other data and information relating to the business, operations, affairs, financial condition, assets or properties of the Company or any of its Subsidiaries as from time to time may be reasonably requested by the Members.

(b) The Company shall, upon the request of any Member, provide such Member, and any qualified institutional buyer designated by such Member, such financial information as such Person may reasonably determine to be necessary in order to permit compliance with the information requirements of Rule 144A under the Securities Act in connection with the resale of Units, except at such times as the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act. For the purpose of this Section 9.2(b), the term "qualified institutional buyer" shall have the meaning specified in Rule 144A under the Securities Act. Notwithstanding this Section 9.2(b), the applicable Member shall reimburse the Company for attorneys' fees incurred in complying with this Section 9.2(b).

(c) The Company shall, upon the request of any Member, permit any Person designated by such Member in writing, at such Member's expense, to visit and inspect any of the properties of the Company and its Subsidiaries, to examine the corporate books and financial records of the Company and its Subsidiaries and make copies thereof or extracts therefrom and to discuss the affairs, finances and accounts of the Company and its Subsidiaries, all at such reasonable times during regular business hours and as often as such Member may reasonably request; provided, that the Company may, at its option, have one or more employees or representatives present at any such inspection, examination or discussion.

(d) Each Member shall be entitled to consult with and advise the management of the Company and its Subsidiaries and the Tax Matters Member, upon reasonable notice at reasonable times from time to time, on all matters relating to the operation of the Company and its Subsidiaries (including, without limitation, tax matters), and each of the Company and the Tax Matters Member agree to consider, and the Company shall cause its Subsidiaries to consider, in good faith such Member's recommendations in connection with the matters on which it is consulted, recognizing that the ultimate discretion with respect to all such matters shall be retained by the Company, such Subsidiary or the Tax Matters Member (as the case may be).

9.3.  **Accounts.**

Subject to any Third Party Restrictions, the Board of Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Board of Managers determines.

## ARTICLE 10
## DISSOLUTION, LIQUIDATION, AND TERMINATION

**10.1.  Dissolution.**

The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

(i)     the written consent of the Founding Member, subject to the veto rights of certain Members as set forth in Section 6.3; or

(ii)    entry of a decree of judicial dissolution of the Company under the applicable provisions of the Act.

**10.2.  Winding Up, Liquidation and Distribution of Assets.**

(a) Upon dissolution of the Company, an accounting shall be made by the Company's accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Board of Managers shall immediately proceed to wind up the affairs of the Company.

(b) If the Company is dissolved and its affairs are to be wound up, the Board of Managers shall, in the following order of priority, (i) sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Board of Managers may determine to distribute any assets to the Members in kind), (ii) allocate any Profits or Losses resulting from such sales to the Members' Capital Accounts in accordance with Article 5 hereof, (iii) discharge all liabilities of the Company (other than liabilities to Members), including all costs relating to the dissolution, winding up, liquidation and distribution of assets, (iv) establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such reserves shall be deemed to be an expense of the Company), (v) discharge any liabilities of the Company to the Members other than on account of their interests in the Company's capital or profits, (vi) distribute assets pro rata among the Common Members until the Capital Contributions of the Common Members, to the extent not previously paid, have been repaid, (vii) distribute assets pro rata among the Profit B Members until each Profit B Member shall receive $1,000 per Profit B Unit, to the extent not previously paid, (viii) to the extent Management Units were issued on more than one date, distribute assets pro rata among the Management Units issued before each such subsequent issuance date and outstanding as of such date and the Common Units in an amount (without duplication) equal to the Capital Account balance as of such date reduced by any prior distributions pursuant to clause (vi), (vii) or this clause (viii), (ix) distribute assets pro rata among the Management Members with respect to Management Units that have vested and with respect to which amounts have been withheld in accordance with Section 5.2(c) and not previously distributed, and (x) distribute the remaining assets pro rata to the Common Members, Profit B Members and the Management Members in accordance with their respective Percentage Interests.

The distribution of the assets in accordance with the above may be made either in cash or in kind, as determined by the Board of Managers, with any assets distributed in kind being

distributed pro rata among the Members, as applicable, and valued for this purpose at their Fair Market Value; provided, however, that any distributions to the Members to be made in cash shall be allocated first to the Common Members to the extent of their Capital Contributions, to the extent not previously paid, second, to the Profit B Members such each Profit B Member shall receive $1,000 per Profit B Unit, to the extent not previously paid, and third, to the Common Members, Profit B Members and the Management Members on a pro rata basis in accordance with their respective Percentage Interests.

(c) If any assets of the Company are to be distributed in kind, the Fair Market Value of such assets as of the date of dissolution shall reasonably be determined in good faith by the Board of Managers. Such assets shall be deemed to have been sold as of the date of dissolution for their Fair Market Value, and the Capital Accounts of the Members shall be adjusted pursuant to the provisions of Article 5 to reflect such deemed sale.

10.3.  **Deficit Capital Accounts.**

Notwithstanding anything to the contrary in this Agreement, no Member shall be obligated to make any Capital Contributions in order to restore a deficit balance in its Capital Account, and a negative balance of a Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

10.4.  **Articles of Dissolution.**

On completion of the distribution of Company assets as provided herein, the Company shall be terminated, and the Board of Managers (or such other Person or Persons as the Act may require or permit), subject to the veto rights of certain Members as set forth in Section 6.3, shall file Articles of Dissolution with the Secretary of State of Delaware, cancel any other filings made pursuant to the Requirements of Law, and take such other actions as may be necessary to terminate the Company.

## ARTICLE 11
## GENERAL PROVISIONS

11.1.  **Fees.**

Subject to any Third Party Restrictions, the Company shall pay, or shall cause one or more of its Subsidiaries to pay, a periodic management fee to Lehman in an amount to be determined by the Board of Managers; provided, however, to the extent the Company is temporarily restricted at any time from making any such payments to Lehman, whether by way of restrictions contained in the Company's loan and other third party arrangements, this Agreement or otherwise, all such payments shall accrue and shall become due and payable upon the lifting of such temporary restrictions.

11.2.  **Offset.**

Except as expressly set forth to the contrary in this Agreement, whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

### 11.3. Notices.

Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested, or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and, except as otherwise provided in this Agreement, a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A, or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company must be given to the Company at 300 Atlantic Street, Stamford, CT 06901, Attention: Mark Landry, Facsimile: (203) 975-0352. Whenever any notice is required to be given by the Requirements of Law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

### 11.4. Entire Agreement.

This Agreement, together with the Certificate and the Registration Rights Agreement, constitute the entire agreement of the Members and their Affiliates relating to the Company with respect to the Units held by the Members and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

### 11.5. Effect of Waiver or Consent.

A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

### 11.6. Amendment or Modification.

Subject to the Requirements of Law and the veto rights of certain Members as set forth in Section 6.3, this Agreement may be amended or modified from time to time by a written instrument executed by the Founding Member; provided, however, that this Agreement may not be amended or modified if such amendment or modification would have a material adverse effect on the rights or obligations of any Member (other than amendments or modifications that would have an equivalent and proportionate (to the extent applicable) material adverse effect on the rights or obligations of all Members) without the written consent of any adversely affected Member.

**11.7.    Binding Effect; No Third Party Beneficiaries.**

Subject to the restrictions on Transfers set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective successors and assigns. There are no third party beneficiaries of this Agreement.

**11.8.    Governing Law; Jurisdiction.**

(a) This Agreement and all rights, remedies, liabilities, powers and duties of the parties hereto shall be governed and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed entirely within such state.

(b) Each of the parties hereto irrevocably agrees that any legal action or proceeding with respect to this Agreement or for recognition and enforcement of any judgment in respect hereof brought by the other party hereto or its successors or assigns shall be brought and determined in the Chancery or other Courts of the State of Delaware, and each of the parties hereto hereby irrevocably submits with regard to any such action or proceeding for itself and in respect to its property, generally and unconditionally, to the exclusive jurisdiction of the aforesaid courts and to accept service of process in any manner permitted by such courts. Each of the parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, (i) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to lawfully serve process, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), (iii) to the fullest extent permitted by the Requirements of Law, that (x) the suit, action or proceeding in any such court is brought in an inconvenient forum, (y) the venue of such suit, action or proceeding is improper or (z) this Agreement, or the subject matter hereof, may not be enforced in or by such courts or (iv) any right to a trial by jury.

**11.9.    Severability.**

In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Act (or to the extent such statutes are incorporated into the Act, the Delaware General Corporate Law), the applicable provision of the Certificate, the Act, or the Delaware General Corporation Law shall control. Whenever possible, each provision of this Agreement shall be interpreted in a manner as to be effective and valid under the Requirements of Law, but if any provision hereof is held to be prohibited by or invalid under the Requirements of Law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or otherwise adversely affecting the remaining provisions hereof. If a court of competent jurisdiction should determine that a provision hereof would be valid or enforceable if a period of time were extended or shortened or a particular percentage were increased or decreased, then such court may make such change as shall be necessary to render the provision in question effective and valid under the Requirements of Law.

### 11.10. Counterparts; Facsimile Signatures.

This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument. This Agreement may be executed by facsimile.

### 11.11. Confidentiality.

Except as may be required by applicable Requirements of Law or as otherwise contemplated by this Agreement, no party hereto shall make any disclosure concerning this Agreement, the transactions contemplated hereby, the Members or the business, performance, structure or governance of the Company or its Subsidiaries (all information relating to such matters is referred to herein as "*Confidential Information*"), without prior approval by the Board of Managers, which approval may be given or withheld by the Board of Managers in its sole discretion; provided, however, that (a) each Member and the Observer may deliver or disclose Confidential Information to (i) such Member's or Observer's directors, officers, employees, agents, attorneys, affiliates and financial and professional advisors (in each case, to the extent such disclosure reasonably relates to the administration of the investment represented by the Membership Units held by such Member) who agree to hold confidential and refrain from using the Confidential Information in accordance with the terms of this Section 11.11 to the same extent as if they were parties to this Agreement, (ii) any other holder of any Membership Unit that is bound by this Section 11.11 to the same extent as such Member, (iii) any Person to which such Member may sell or offer to sell any Membership Unit or any part thereof or any participation therein (provided that the Board of Managers has approved such sale or offer to sell pursuant to Section 3.5(a)), but only if such Person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section 11.11 to the same extent as such Member, (iv) any federal or state regulatory authority having jurisdiction over the Member, (v) the National Association of Insurance Commissioners or any similar organization, or any nationally recognized rating agency that requires access to information about such Member's investment portfolio or (vi) any other Person to which such delivery or disclosure may be reasonably necessary (x) to effect compliance with any applicable Requirements of Law or (y) in connection with any litigation or in order to honor any subpoena or similar legal process that seeks discovery of the Confidential Information if a motion for a protective order, motion to quash and/or other motion filed to prevent the production or disclosure of the Confidential Information has been denied; provided, that in the case of (a)(iv), (a)(v) and (a)(vi), such Member discloses only that portion of the Confidential Information which such Member's legal counsel advises such Member is legally required, and such Member exercises all reasonable efforts to preserve the confidentiality of the remainder of the Confidential Information; and (b) Confidential Information shall not include, as to any particular Member, information which (i) is or becomes generally available to the public other than as a result of a direct or indirect disclosure by such Member, (ii) was within such Member's possession on a non-confidential basis prior to it being furnished to such Member by or on behalf of the Company or (iii) is received from a source other than the Company or any of its representatives; provided, that in the case of (b)(ii) and (b)(iii) above, the source of such information was not actually known or reasonably suspected by such Member, after reasonable commercial inquiry, to be prohibited from disclosing such information by a contractual, legal or fiduciary obligation of confidentiality to the Company or to any other party with respect to such information. If any announcement is

so required by applicable Requirements of Law with respect to any party hereto, prior to making such announcement, such party will, if not prohibited by applicable Requirements of Law, deliver a draft of such announcement to the Board of Managers and shall give the Board of Managers reasonable opportunity to comment thereon.

**11.12. Further Assurances.**

Each Member agrees to execute, acknowledge, deliver, file and record such further certificates, instruments and documents, and to take reasonably commercial steps to do all such other acts and things, as may be set forth in the Requirements of Law or as, in the reasonable judgment of the Founding Member or the Board of Managers, may be necessary or advisable to give effect to or evidence the provisions of this Agreement.

[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Members have executed this Agreement as of the date first set forth above.

PHOENIX BRANDS LLC

By:_____ _____
    Name: Mark Landry
    Title:  Manager

LEHMAN PHOENIX SPV LLC

By:    Lehman Brothers MBG Partners L.P., its
    Manager

By:    Lehman Brothers MBG Associates L.P., its
    General Partner

By:    LBI Group Inc., its General Partner

By:_____
    Name: Fred Steinberg
    Title:  Vice President

PHOENIX INVESTORS LLC

By:_____
    Name: Steve Witkoff
    Title:  Manager

OCM PHOENIX HOLDINGS, INC.

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

_____

Mark Landry


_____

Sanjiv Mehra


_____

Jill Boerger


_____

Constance Fassuliotis


_____

Brendan Holden


_____

John Hudspeth


_____

Barry Kay


_____

Christopher McGovern


_____

Melvin Siler

_____

Gary Silver


_____

Alice Wu


_____

Lori Sullivan


_____

Jim Hallonquist


_____

Mark A. DeMuro

Signature Page to Third Amended and Restated Limited Liability Company Agreement

EXHIBIT A

MEMBERS
(Updated as of January 1, 2005)

| Name and Address of Member | Type of Unit(s) | No. of Unit(s) | Capital Account |
|---|---|---|---|
| Lehman Phoenix SPV LLC<br>c/o LB I Group Inc.<br>399 Park Avenue, 9th Floor<br>New York, NY 10022<br>Attn: Daniel James<br>Fax: (646) 758-3831 | Common | 40,000 | $40,000,000 |
| Phoenix Investors LLC<br>c/o The Witkoff Group LLC<br>220 East 42nd Street, 26th floor<br>New York, NY 10017<br>Attn: Steve Witkoff<br>Fax: (212) 672-3434 | Common | 7,500 | $7,500,000 |
| OCM Phoenix Holdings, Inc.<br>c/o OCM Mezzanine Fund L.P.<br>1301 Avenue of the Americas<br>34th Floor<br>New York, NY 10019<br>Attn: Gary Trabka and<br>        William Casperson<br>Fax: (212) 284-1969 | Common | 4,000 | $4,000,000 |
| Mark Landry<br>43 Signal Hill Road South<br>Wilton, CT 06897<br>Fax: (203) 761-9578 | Common | 500 | $500,000 |
| Sanjiv Mehra<br>11 Stonehouse Road<br>Scarsdale, NY 10583<br>Fax: (914) 472-6081 | Common | 25 | $25,000 |
| Various management | Management Units | 4,654 | $0 |
| Various employees | Profit B Units | 2,000 | $0 |

EXHIBIT B

MANAGEMENT UNIT GRANT AGREEMENT

This Management Unit Grant Agreement (this "Agreement"), dated as of October __, 2004 is between _____ (the "Executive") and Phoenix Brands LLC, a Delaware limited liability company (the "Company").

RECITALS

WHEREAS, Section 3.2(b) of the Second Amended and Restated Limited Liability Company Agreement of the Company (the "LLC Agreement") provides that the Board of Managers of the Company is authorized, by resolution or resolutions, to grant Management Units (as defined in the LLC Agreement) to officers of the Company;

WHEREAS, by an action by written consent of the Board of Managers of the Company on October 1, 2004, the Board of Managers approved the issuance of Management Units to officers of the Company; and

WHEREAS, in consideration of the Executive's services as an officer of the Company and the additional efforts that the Executive will expend to expand the Company's business and opportunities, the Company desires to grant Management Units to the Executive upon the terms and conditions hereinafter set forth.

AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the agreements herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

Section 1.    Definitions.  Capitalized terms used but not defined herein shall have the meaning ascribed thereto in the LLC Agreement.  When used in this Agreement:

"Change of Control" means (a) any sale, exchange or other transfer of all or substantially all of the property, assets or business of the Company (or its successor entity pursuant to Section 3.9 of the LLC Agreement); (b) any merger or consolidation to which the Company (or its successor entity) is a party or any sale or other transfer through a single or a series of transactions in which the holders of the voting securities of the Company (or its successor entity) is a party or any sale or other transfer through a single or a series of transactions in which the holders of the voting securities of the Company (or its successor entity) immediately prior thereto own less than fifty percent (50%) of the outstanding voting securities of the surviving entity immediately following such transaction; or (c) any sale or other transfer through a single transaction or a series of transactions that results in the holders of the voting securities of the Company (or its successor entity) immediately prior thereto owning less than fifty percent (50%) of the outstanding voting securities of the Company (or its successor entity) immediately following such transaction or transactions.

"Cause" means (a) the willful and continued failure or refusal of the Executive to substantially perform the duties required of him or abide by the code of conduct applicable to him as an Executive of the Company after the Executive is given written notice of such duties or code of conduct by the Company, (b) any willful and material violation by the Executive of any law or regulation applicable to the business of the Company or any of its Subsidiaries, or the Executive's conviction of, or a plea of nolo contendere to, a felony, or any willful perpetration by the Executive of a common law fraud, or (c) any other gross negligence or willful misconduct by the Executive that is materially injurious to the financial condition or business reputation of, or is otherwise materially injurious to, the Company or any of its Subsidiaries.

### Section 2.      Management Units.

(a)      Grant of the Management Units.  The Company hereby grants to the Executive [_____] Management Units.

(b)      Vesting.  The Management Units shall be unvested upon grant, and shall vest over a five-year period, with 20% of the aggregate Management Units granted to the Executive to vest beginning on January 5, 2005 and on each anniversary thereof; provided that the Executive continues to be employed by the Company or its Subsidiaries on each such vesting date.

(c)      Change of Control.  Upon a Change of Control of the Company or an initial public offering of the Company's equity securities (or the equity securities of a successor entity of the Company pursuant to Section 3.9 of the LLC Agreement), all unvested Management Units (or securities issued in lieu thereof by a successor entity pursuant to Section 3.9 of the LLC Agreement) shall vest immediately; provided that the recipient has remained continuously employed by the Company or its Subsidiaries through the date on which such initial public offering or Change of Control is consummated.  Upon a Change of Control and the concurrent vesting of the outstanding Management Units, the Executive shall have a Tag-Along Right with respect to such Change of Control, as set forth in Section 3.5(c) of the LLC Agreement, and the Executive shall be treated in connection with his exercise of the Tag-Along Right as if he were holding Common Units; provided, however, that the consideration to be paid with respect to such Management Units vis-à-vis the Common Units shall be determined based on the relative Fair Market Value of each Membership Unit in accordance with the terms of the LLC Agreement.

### Section 3.      Forfeiture.

(a)      Unvested Units.  In the event that the Executive's employment by the Company or its Subsidiaries is terminated for any reason or for no reason, all unvested Management Units shall be forfeited immediately upon such termination of employment and become null and void.

(b)      Vested Units.

(i)      In the event that the Executive's employment by the Company or its Subsidiaries is terminated by the Company or by the Executive for any reason or no reason, except for terminations for Cause by the Company or by reason of death of the Executive, the Company shall have the right, but not the obligation, to repurchase all or any portion of the vested Management Units held by the Executive (and/or his Permitted Transferees or estate) within 90 days of the termination of employment at a purchase

price equal to the Fair Market Value of the vested Management Units; provided, however, the Company shall have the right to assign its right of repurchase hereunder to any other person, at the sole discretion of the Company, including, but not limited to, the then Members of the Company; provided further, in the event that the Executive's employment by the Company is terminated by reason of the death of the Executive, the Company shall offer to repurchase all of the vested Management Units held by the Executive in the manner set forth in this Section 3(b)(i).

(ii)    In the event that the Executive's employment by the Company or its Subsidiaries is terminated at any time by the Company for Cause, all vested Management Units shall be forfeited immediately upon such termination of employment and become null and void.

Section 4.    Restrictions.

(a)    Prohibitions on Transfer.  Notwithstanding any provision to the contrary in this Agreement, the Management Units are not transferable except in accordance with Section 3.5 of the LLC Agreement.

(b)    Restricted Securities.  The Executive acknowledges and understands that (i) the issuance of the Management Units will not be registered under any federal, state or other securities law, and they will therefore be "restricted securities" under Rule 144 of the Securities Act, and (ii) the Management Units may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, and (iii) the Company is not required to register the Management Units, except pursuant to any registration rights granted to the Executive pursuant to the Registration Rights Agreement entered into by the Executive with the Company dated as of July 29, 2004.

Section 5.    Representations and Warranties.

(a)    The Company hereby represents and warrants to the Executive that (i) the Company is duly formed and validly existing and has full company power and authority to enter into and perform this Agreement, (ii) the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, including, without limitation, the issuance of the Management Units, have been authorized by the Board of Managers of the Company, (iii) this Agreement has been duly executed and delivered and constitutes a valid and binding obligation of, and shall be fully enforceable against, the Company, and (iv) the Management Units, when issued and delivered upon due execution of this Agreement by the Company and the Executive, will be duly authorized, validly issued and fully paid.

(b)    The Executive hereby represents and warrants to the Company that (i) this Agreement has been duly executed and delivered by the Executive and constitutes a valid and binding obligation of, and shall be fully enforceable against, the Executive, (ii) the Executive will notify the Company of the Executive's intention to make an election pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, with respect to the Management Units for the Executive's taxable year ending December 31, 2004, (iii) the Executive is acquiring the Management Units for its own account and not with a view to

distribution or resale in any manner which would be in violation of the Securities Act, and (iv) the Executive is an "accredited investor" within the meaning of Rule 501(a)(4) under the Securities Act and has generally such knowledge and experience in business and financial matters and with respect to investments in securities of privately held companies that the Executive is capable of understanding and evaluating the merits and risks, and is able to bear the economic risk, of acquiring the Management Units pursuant to this Agreement.

Section 6.    Miscellaneous.

(a)    Amendment.  No amendment or modification of any of the provisions of this Agreement shall be effective unless in writing and signed by both the Company and the Executive.

(b)    Entire Agreement.  This Agreement and the LLC Agreement constitute the entire agreement and understanding between the Company and the Executive with respect to the Management Units and supersede all prior agreements and understandings, both written and oral, with respect to the Management Units.  This Agreement and the powers, preferences, rights, qualifications and limitations of the Management Units granted hereunder shall remain subject to the terms of the LLC Agreement and any amendments or modifications thereto.

(c)    Governing Law.  This Agreement and all rights, remedies, liabilities, powers and duties of the parties hereto shall be construed and interpreted according to, and governed by, the laws of the State of Delaware applicable to agreements made and to be performed entirely within such state.

(d)    Notices.  All notices, requests, or other communications provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested, or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and, except as otherwise provided in this Agreement, a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it.  All notices, requests, and consents to be sent to a party must be sent to or made at the addresses given for that party below (or such other address as that party may specify by notice to the other party):

If to the Company:

Phoenix Brands LLC
300 Atlantic Street
Stamford, CT 06901
Facsimile: (203) 975-0352
Attn: Mark Landry

with a copy to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166

Facsimile: (212) 351-5316
Attn: Steven R. Shoemate, Esq.

If to the Executive:

[Executive Contact Information]

(e)    Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability (but shall be construed and given effect to the extent possible), without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

(f)    Status as an Officer.  Neither this Agreement nor the Management Units granted hereunder shall confer upon the Executive the right to continue to serve as an officer of the Company.

(g)    Successors.  This Agreement shall be binding upon and shall inure to the benefit of each party hereto and its successors and permitted transferees.

(h)    Payment of Withholding Tax.  In the event the Company determines that any federal, state or local tax or any other charge is required by law to be withheld or paid with respect to the grant or vesting of the Management Units, the Executive shall, upon notice from the Company, pay to the Company, in cash, an amount equal to such withholding tax or charge as determined by the Company in its sole discretion.  In the case taxes or other charges are determined to be payable on the grant of Management Units, the Company may defer issuing such Management Units and admitting the Executive as a member of the Company with respect to such Management Units until satisfactory arrangements for the payment of such tax or other charge have been made.

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Agreement as of the date first written above.

_____

[Executive]


PHOENIX BRANDS LLC


By:_____
Name:
Title: